68 F.Supp.2d 455 (1999)
Joann PALLADINO, on behalf of the UNITED STATES of America, and individually; and Darlene Keegan, on behalf of the United States Of America, Plaintiffs,
v.
VNA OF SOUTHERN NEW JERSEY, INC., Southern New Jersey Visiting Nurse Service System, Inc., M. Kelly Cooke, Judy Demby, Julie Melendez, Christine McCullough, Wayne Whelan, And Maryanne Czoch, Defendants.
Civil Action No. 96-2252 (JBS).
United States District Court, D. New Jersey.
June 30, 1999.
*456 *457 Carlo Scaramella, H. Thomas Hunt, III, Anthony L. Marchetti, Jr., Cherry Hill, NJ, for Plaintiffs.
Steven W. Suflas, Nicholas C. Harbist, Peter L. Frattarelli, Archer & Greiner, Haddonfield, NJ, for Defendants VNA of Southern New Jersey, Inc., Southern New Jersey Visiting Nurse Service System, Inc., Judy Demby, Julie Melendez, Christine McCullough, and Maryanne Czoch.
Patricia Smith, Constance Petroni Lahoda, Pepper, Hamilton LLP, Cherry Hill, NJ, for Defendant M. Kelly Cooke.
Faith S. Hochberg, United States Attorney by Joseph Braunreuther, Assistant United States Attorney, Newark, NJ.

OPINION
SIMANDLE, District Judge.

 TABLE OF CONTENTS
Introduction ........................................................... 458
I. BACKGROUND .......................................................... 458
II. DISCUSSION ......................................................... 461
 A. Motion to Dismiss Standard....................................... 461
 B. Count I  Liability Under §§ 3729(a)(1), (2), & (3) ............. 462
 C. Count II  Individual Liability Under Whistleblower Provision,
 § 3730(h) ....................................................... 464
 D. Count III  CEPA Liability ...................................... 465
 1. Whether CEPA is Preempted as a Matter of Federal Law ........ 465
 a. The English Categories of Preemption ..................... 466
 b. Precedents ............................................... 469
 2. Whether CEPA is Preempted as a Matter of State Law .......... 470
 3. Whether there is Individual Liability Under CEPA ............ 471
 E. Count IV  Defamation ........................................... 474
 1. Amended Complaint ........................................... 474
 2. Proposed Amendment .......................................... 475
 F. Count V  Plaintiff Keenan's Qui Tam Claim ...................... 477

*458
III. CONCLUSION ........................................................ 479

This case involves allegations of fraud against the federal government by a nursing service, its subsidiary, and various of its employees. Plaintiff Joann Palladino filed a qui tam complaint under the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a) against the various defendants, as well as claims of defamation and claims of retaliation for her "whistleblowing" under § 3730(h) of the FCA and under New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, et seq. Plaintiff Darlene Keegan also brings a qui tam claim as a relator within the same action.
This opinion must decide several issues of first impression, including whether the federal False Claims Act preempts an action by the plaintiff-employee arising from the same circumstances under the New Jersey Conscientious Employee Protection Act, and whether CEPA permits an action for individual liability against supervisors who allegedly precipitated plaintiff's retaliatory discharge.
Various motions are currently before the Court, including the motion of defendants VNA of Southern New Jersey, Inc. ("VNA"), Southern New Jersey Visiting Nurse Service System, Inc. ("VNSS"), Judy Demby, Julie Melendez, Christine McCullough, and Maryanne Czoch[1] for partial dismissal of the Amended Complaint, upon defendant M. Kelly Cooke's separate motion to dismiss the Amended Complaint against her in its entirety, and upon plaintiff Joann Palladino's motion to amend Count IV of the Amended Complaint. For the reasons stated herein, Ms. Palladino's motion to amend will be granted, and all defendants' motions to dismiss will be granted in part and denied in part.

I. BACKGROUND

The facts as alleged are as follows. For the purposes of this motion, the facts as alleged are taken as true. Plaintiffs Joann Palladino and Darlene Keegan are licensed and registered nurses who were formerly employed by defendant VNA of Southern New Jersey, Inc. ("VNA"), a home health agency operated out of its headquarters in Runnemede, New Jersey. (Amended Compl. ¶¶ 4, 12, 60.) Visiting Nurse Service System, Inc. ("VNSS") is the parent company of VNA, and it provides VNA with management and support services. (Id. at ¶ 5.) According to Ms. Palladino and Ms. Keegan, VNA, VNSS, and various VNA corporate officials and supervisors, including M. Kelly Cooke, Judy Demby, Julie Melendez, Christine McCullough, and Maryanne Czoch, engaged in a scheme of billing for unnecessary and improper home health services for patients who were not home bound and who did not require skilled nursing care, thus receiving overpayments from the United States government. (Id. at ¶¶ 6-10.)
Ms. Palladino worked for VNA from 1991 until February 13, 1996, when she was fired. (Id. at ¶¶ 13, 41.) On December 19, 1994, Ms. Palladino left the Runnemede office to become a Collaborative Practice Nurse in VNA's Philadelphia branch office. (Id. at ¶ 14.) In May of 1995, defendant Cooke was transferred to the Philadelphia office and became Ms. Palladino's supervisor. (Id. at ¶ 15.) At about that time, VNA formed a business relationship with Dr. Eric Paul Rosen, whose medical license had previously been suspended in 1983 after he was convicted of fifteen counts of fraud and one count of arson, whereby Dr. Rosen would refer home-care patients to VNA. (Id. at ¶¶ 16, 17.) VNA would bill Medicare or Medicaid for these services pursuant to Medicare/Medicaid rules and regulations, which require that the patients: (a) be homebound; (b) be in need of skilled nursing services; and (c) be in need of intermittent, short-term nursing care. (Id. at 16, 18.)
*459 Shortly after Dr. Rosen began referring patients to VNA, Ms. Palladino noticed that many of the patients did not meet one or more of the Medicare/Medicaid eligibility requirements, and she allegedly complained of this to Cooke. (Id. at ¶¶ 19-20.) Cooke allegedly informed Ms. Palladino that ineligible patients would continue to be seen by the staff and that nurses would have to "find a reason" to make the patient eligible if the nurse's note did not reflect that the patient was eligible. (Id. at ¶ 20.)
In August of 1995, Ms. Palladino began assisting Cooke and another co-worker in reviewing patient charts for audit purposes. (Id. at ¶ 21.) While doing so, Ms. Palladino allegedly discovered that nurses were not documenting skilled visits, that patient charts were not properly completed, and that many visits (particularly for Dr. Rosen's patients) did not require skilled nursing services  making those patients ineligible for Medicare and Medicaid benefits. (Id.) Ms. Palladino allegedly raised a concern about the charts to Quality Assurance, to the Vice-President of Customer Service, to the Director of Admissions, and to defendant Demby, VNA's Director of Patient Services. (Id. at ¶ 7, 22.) In October of 1995, Palladino also allegedly complained to the Vice President of Customer Service that the Philadelphia office was violating Medicare/Medicaid rules, but nothing was done. (Id. at ¶ 23.)
Also in October of 1995, Cooke allegedly instructed Palladino to "fix" the charts of Dr. Rosen's patients and to resubmit them to Medicare/Medicaid so that VNA could be paid, but Palladino told Cooke that while Palladino would audit the charts, she would not "fix" or alter them because to do so would be illegal. (Id. at ¶ 24.) According to the Amended Complaint, Cooke responded by saying that VNA had to get paid. (Id.)
On October 21, 1995, Palladino was officially promoted to the position of Nursing Supervisor, the duties of which included supervising the nurses to ensure adherence to VNA standards and procedures. (Id. at ¶ 25.) Near the end of that month, Cooke designated Palladino as the sole employee responsible for obtaining Medicaid authorizations and instructed Palladino to lie to Medicaid, if necessary, by falsifying patient information in order to obtain all authorizations for Medicaid visits. (Id. at ¶ 26.) Palladino refused to do so. (Id.)
Towards the end of that month, Palladino informed VNA's Director of Admissions, that many of Dr. Rosen's patients did not qualify for VNA's services, and, in November, Quality Assurance Employees from the Runnemede office began to make visits to the Philadelphia offices, allegedly confirming Palladino's complaints. (Id. at ¶¶ 27-28.) In mid-November, Palladino complained again to defendant Demby about Dr. Rosen, and Demby asked Palladino to give her some of Dr. Rosen's patient names. (Id. at ¶ 29.) Demby allegedly entered those names into the computer and discovered that all of the patients had the same diagnosis, the same medication, and the same length of stay. (Id.)
In mid-November of 1995, Cooke allegedly hired two other nurses to handle Dr. Rosen's patients, despite the fact that no additional nurses were needed, in order to allow for the replacement of nurses who had complained about Dr. Rosen's referral practices. (Id. at ¶ 30.) In the beginning of December, Palladino allegedly learned that two case managers had been instructed to "fix" charts and alter records, and Palladino informed defendant Demby of this. (Id. at ¶ 32.) Palladino also told Demby that Cooke was treating a black employee in a discriminatory fashion. (Id. at ¶ 33.)
In January of 1996, Cooke allegedly instructed Palladino to sign time sheets giving hours to employees who did not work those hours. (Id. at ¶ 34.) Palladino complained to Wayne Whelan, Cooke's supervisor, about this, and he told Palladino not to sign the sheets. (Id.) On January 17, 1996, Palladino allegedly met again with *460 defendant Demby and defendant Melendez, VNA's Director of Risk Management, complaining about the practices of the Philadelphia office.
According to the Amended Complaint, on February 13, 1996, Cooke told Palladino that Palladino should resign because she had put the agency at liability because of a problem with her driver's license, something about which Palladino was baffled because Palladino had previously apprised Cooke concerning a problem in renewing her driver's license. (Id. at ¶ 41.) Moreover, Palladino was baffled because her job responsibilities did not require her to drive on company time. (Id.) Nonetheless, Cooke allegedly told Palladino that it would be much better if Palladino resigned and "went away quietly." (Id.) Palladino refused to resign. (Id.)
The next day, Palladino met with defendant McCullough, VNA's Vice-President of Human Resources. (Id. at ¶ 42.) McCullough allegedly showed Palladino a copy of Palladino's driver's license that McCullough claimed "had been altered," which Palladino claimed was false, something which Whelan confirmed. (Id.) About that time, Palladino became concerned that Cooke was establishing a pre-textual reason for Palladino's discharge, which allegedly was truly because of Palladino's complaints. (Id. at ¶ 43.) At 8:15 a.m. on Monday, February 19, 1996, defendant McCullough called Palladino at home and told her that she was terminated and should not come to work. (Id. at ¶ 44.) According to the Amended Complaint, Cooke and other agents of VNA and VNSS told third parties that Palladino had been terminated for cause and because she altered her driver's license, statements which were false and which injured Palladino's reputation in her profession. (Id. at ¶¶ 55-57.) A cross-motion by the plaintiffs currently before this Court alleges more specific details about the statements allegedly made to other doctors, health care professionals, and employers seeking references.
On February 21, 1996, Palladino met with defendant Czoch, the President of VNA, in order to complain about the activity in the Philadelphia office, informing Czoch that her driver's license was being used as a pretext for her termination. (Id. at ¶ 45.) Czoch allegedly stated that she would look into the matter, but Palladino later received a letter affirming her discharge. (Id. at ¶ 46.) According to the Amended Complaint, defendants Cooke, Melendez, Demby, McCullough, and Czoch all concurred with, approved of, and ratified the decision to termination Palladino because of the complaints she had made regarding VNA's allegedly fraudulent Medicare/Medicaid billing practices. (Id. at ¶ 47.) Palladino's counsel wrote a letter to VNA requesting an investigation of the allegedly pretextual discharge. (Id. at ¶ 48.) VNA's response did not deny the allegations of pretext and did admit that an audit of the Philadelphia office showed that office documentation did not comply with VNA's standards of practice. (Id.) The response letter did not discuss allegations of fraud, and Palladino believes that Cooke controlled the audit and led auditors away from files which would evidence fraud. (Id.) Palladino alleges that VNA and VNSS (not limited to the Philadelphia office) knowingly submitted false and fraudulent Medicare/Medicaid claims to the United States government which the United States government paid, and that VNA "compensates" Dr. Rosen for his illegal referrals to VNA by entering into illicit arrangements with him or entities which he or his family controls. (Id. at ¶¶ 36-37.)
On May 1, 1996, Palladino filed a qui tam complaint under seal alleging that VNA, VNSS, and the individual defendants violated the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)-(3); she additionally alleged violations of § 3730(h) of the False Claims Act; the Conscientious Employee Protection Act, N.J.S.A. 34:19-1, et seq., and common law defamation. On August 25, 1997, plaintiff Darlene Keegan joined *461 the suit as an additional relator, describing allegations of improper billing in VNA's Runnemede, New Jersey headquarters of VNA, and thus the Amended Complaint was filed under seal.
According to Keegan, she was hired by VNA on May 26, 1993 in VNA's Runnemede office. (Amended Compl. ¶ 63.) She began as a fee for service nurse, visiting patients in their homes on weekends. (Id. at ¶ 65.) After a few months, Keegan allegedly began to see a trend whereby many patients, especially those of Dr. Churchill Blakey, were receiving skilled nursing care despite the fact that they were not truly homebound and did not need such services. (Id. at 65.) Thereafter, Keegan was assigned to be a triage nurse, handling telephone calls, assigning out nurses for existing patients, and handling emergency or new patient calls during her shift hours. (Id. at ¶ 66.) Part of Keegan's responsibilities included receiving regular "reports" from nurses who went out on home visits. (Id.) From these reports, Keegan allegedly discovered that many patients treated by VNA were not properly treated or billed under Medicare/Medicaid standards. (Id. at ¶ 67.) Keegan allegedly began to complain to her supervisors, who told Keegan not to question the homebound status or skilled nursing need status, but merely to assign nurses out. (Id. at ¶ 71.) Keegan was allegedly told not to discharge any patients before the maximum time permitted for their care. (Id.) These instructions came in part from defendant Demby. (Id. at ¶ 72.) Keegan believes that VNA and VNSS, along with the participation of defendants Cooke, Demby, Melendez, Czoch, and various others, have engaged in an improper billing scheme designed to defraud the United States out of Medicare/Medicaid funds. (Id. at ¶¶ 74-76.)
On October 6, 1997, the government filed a notice of election to intervene in the allegations of plaintiffs' Amended Complaint. On April 3, 1998, the government filed its own Amended Complaint alleging violations of the False Claims Act, declining, on April 6, 1998, to intervene in plaintiffs' Amended Complaint.[2] On April 7, 1998, the Court entered an Order unsealing the Complaint and Amended Complaint, but retaining all previous filings with the Court under seal. The defendants' motions to dismiss and the plaintiffs' cross-motion to amend the Amended Complaint are now before this Court.

II. DISCUSSION

A. Motion to Dismiss Standard

A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A district court must accept any and all reasonable inferences derived from those facts. Unger v. National Residents Matching Program, 928 F.2d 1392 (3d Cir.1991); Glenside West Corp. v. Exxon Co., U.S.A., 761 F.Supp. 1100, 1107 (D.N.J.1991); Gutman v. Howard Sav. Bank, 748 F.Supp. 254, 260 (D.N.J.1990).
The question before the court is not whether the plaintiff will ultimately prevail; rather, it is whether he can prove any set of facts in support of his claims that would entitle plaintiff to relief. Hishon v. *462 King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). "Although the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Baldwin County Welcome Center v. Brown, 466 U.S. 147, 150 n. 3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).
Therefore, in deciding a motion to dismiss, a court should look to the face of the complaint and decide whether, taking all of the allegations of fact as true and construing them in a light most favorable to the nonmovant, plaintiff's allegations state a legal claim. Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir.1990).

B. Count I  Liability Under §§ 3729(a)(1), (2), & (3)

Count I of the Amended Complaint alleges that VNA, VNSS, and all of the individual defendants are liable to the United States for violation of the False Claims Act, 31 U.S.C. § 3729(a) ("FCA"). Only defendant Cooke has moved to dismiss this count, arguing that Ms. Palladino has not stated a claim against her under any of the three subsections of § 3729(a).
There are three separate types of violations under § 3729(a). Persons may be liable for knowingly presenting or causing to be presented false claims for payment from the United States government. 31 U.S.C. § 3729(a)(1). Persons may be liable for knowingly making, or causing to be made, false records or statements in order to receive payment from the Government. Id. at § 3729(a)(2). Finally, those who act together to conspire to have the government pay a false or fraudulent claim may be liable. Id. at § 3729(a)(3). Because claims under the FCA are claims of fraud, the pleading rules are somewhat more specific: plaintiffs must allege those claims with particularity. Fed.R.Civ.P. 9(b). See also United States ex rel LaCorte v. SmithKline Beecham Clinical Laboratories, Inc., 149 F.3d 227, 234 (3d Cir.1998). Particularity includes "specifying the time, place, and substance of the defendant's alleged conduct." Id. (citing Cooper v. Blue Cross & Blue Shield of Florida 19 F.3d 562, 567 (11th Cir.1994)).[3]See also In re Stac Electronics Sec. Litig., 89 F.3d 1399, 1404 (9th Cir.1996); Mruz v. Caring, Inc., 991 F.Supp. 701, 719 n. 26 (D.N.J.1998) (quoting Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1020 (7th Cir. 1992)).
Defendant Cooke does not argue that Ms. Palladino has failed to allege her claim with particularity in terms of specific dates or conduct. Rather, Ms. Cooke contends that the conduct in which Ms. Palladino alleges Ms. Cooke engaged does not violate any of the three provisions of § 3729(a). As to § 3729(a)(1), says Ms. Cooke, while Ms. Palladino alleged that "defendants VNA or VNSSJ submitted to the United States of America, many requests for Medicare/Medicaid reimbursement which VNA knew to be false or *463 fraudulent and the United States of America paid for these claims" (Amended Compl. ¶ 36), the Amended Complaint contains no factual allegation that Ms. Cooke herself submitted a fraudulent claim to the government. As to § 3729(a)(2), Cooke argues, while the factual allegations of the Amended Complaint would establish that Cooke attempted to have false records made in order to defraud the government, there is no factual allegation that Ms. Cooke was successful in her efforts. Finally, Ms. Cooke argues that while the Amended Complaint does allege that VNA and VNSS conspired with Dr. Rosen to present false claims to the government, there are no allegations that Ms. Cooke participated in this conspiracy, and thus there is no claim under § 3729(a)(3).
As stated earlier, when deciding if the plaintiff can prove no set of facts which would entitle it to relief such that a motion to dismiss should be granted, it is this Court's duty to read the Complaint as a whole and draw any and all reasonable inferences for the plaintiff. Unger, 928 F.2d 1392. Keeping this in mind, the Court finds that Ms. Palladino has stated claims against Ms. Cooke under all three subsections of § 3729(a). It is true that Ms. Palladino did not specifically include factual allegations which stated that "Ms. Cooke submitted false claims to the government," that "Ms. Cooke was successful in having records falsified," or that "Ms. Cooke conspired with VNA and Dr. Rosen to submit falsified Medicare and Medicaid forms to the government." However, taking all of the factual allegations as true and construing them in a light most favorable to the nonmovant, here Ms. Palladino, the "missing" allegations can easily be inferred.
Taken together, Ms. Palladino alleges that in May 1995, VNA's Philadelphia office entered into an agreement with Dr. Rosen by which he would refer patients to VNA in return for referrals to service providers that he or his family controlled. (Amended Compl. ¶ 16.) Palladino allegedly found that many of Dr. Rosen's patients were not eligible for services and informed Ms. Cooke of this. (Id. at ¶ 20.) Ms. Cooke allegedly told Ms. Palladino that VNA would keep providing services nonetheless and that nurses should "find a reason" to make the patients eligible. (Id.) That October, Ms. Cooke allegedly instructed Ms. Palladino to "fix" charts for Dr. Rosen's Medicaid payments and resubmit those to the government so that VNA could get paid, but Ms. Palladino refused to "fix" or alter charts. (Id. at ¶ 24.) Ms. Cooke allegedly later instructed Ms. Palladino to obtain all authorizations for Medicaid visits, lying to Medicaid, if necessary, by falsifying patient information. (Id. at ¶ 26.) When Ms. Palladino refused to do so and complained to others at VNA (also alleged to be conspirators in the plan to defraud the government), Ms. Cooke allegedly hired two other nurses to handle Dr. Rosen's patients even though no additional nursing staff was needed, in order to replace nurses who complained about Dr. Rosen's practices. (Id. at ¶¶ 26-30.) The Amended Complaint then alleges that VNA and VNSS were successful in getting the government to pay for falsified claims. (Id. at ¶ 36.)
Accepting these allegations as true and taking all reasonable inferences from them, it can be inferred that Ms. Palladino alleges that Ms. Cooke was participating in a conspiracy with the other defendants to whom Ms. Palladino complained, as well as VNA and VNSS in general and Dr. Rosen, to defraud the government. This conspiracy, which is alleged to have been successful, was to be carried out by having Ms. Cooke and others aid and abet VNA by submitting records to the government which were falsified by members of Ms. Cooke's staff, such as the nurses who Ms. Cooke hired despite the alleged lack of need for them. Clearly, then, Ms. Palladino is alleging that Ms. Cooke submitted falsified claims to the government, that she conspired with others to defraud the government, and that she caused others to *464 falsify documents in pursuance of that plan. Therefore, Count I of the Amended Complaint will not be dismissed.

C. Count II  Individual Liability Under Whistleblower Provision, § 3730(h)

All of the individual defendants move to dismiss Count II against them, arguing that there is no individual liability under the whistleblower provision of the FCA, 31 U.S.C. § 3730(h). After reading the defendants' briefs in this regard, Ms. Palladino agrees that there is no individual liability under the False Claims Act for individuals that are not her employer. However, she asks that this Count be dismissed against the individual defendants without prejudice to her right to reallege it if discovery uncovers evidence that any of these individuals were her "de facto" employer. Defendants ask that the dismissal be with prejudice.
This Court agrees that this Count as alleged against the individual defendants should be dismissed with prejudice. Section 3730(h) plainly limits its scope to only "employers":
Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section ... shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court for the relief provided in this subsection.
31 U.S.C. § 3730(h) (emphasis added). Judge Orlofsky recently addressed the scope of this section in Mruz v. Caring, Inc., 991 F.Supp. 701 (D.N.J.1998). Looking to the statute, he noted that the plain language clearly extends liability to the employment relationship. Id. at 709. Though the statute does not define "employer," Judge Orlofsky noted that the statute prohibits discriminatory actions with respect to employment conditions and that only an employer could logically grant the relief which § 3730(h) makes available. Moreover, he noted, because Congress provided for liability for fraud by even those who are not employers under § 3729, Congress obviously knew how to provide liability for non-employers if it had intended to do so under the whistleblower provision. Id. Judge Orlofsky then looked for an employment relationship between the plaintiffs and individual defendants. Id. at 710. With the exception of one defendant, who was alleged to have dominated and dictated the actions of the defendant corporations and their boards "and to have been conducting the affairs of the [defendant corporations] in a way which benefitted her ... personally," thus making her a de facto employer, all of the individual defendants were alleged merely to have defined and supervised the plaintiffs' jobs, and thus those defendants could not be considered plaintiffs' employers. Id. See also United States ex rel. Lamar v. Burke, 894 F.Supp. 1345, 1347-48 (E.D.Mo.1995) (applying Title VII definition of employer and finding that employer does not extend to corporate supervisors or president of defendant corporation).
Ms. Palladino concedes that there is no individual liability for non-employers under § 3730(h), but she asks that the dismissal of this claim be without prejudice to her right to refile should discovery show that the individuals were de facto employers, like the one which Judge Orlofsky mentioned in Mruz. Her argument is unavailing. Here, Ms. Palladino did not allege that any of the individual defendants so dominated and controlled VNA/VNSS that *465 she was Ms. Palladino's true employer; rather, she alleged that the various individual defendants were her supervisors or co-workers who aided and abetted in retaliating against her, which is an insufficient allegation under § 3730(h). Presumably, Ms. Palladino would not need discovery in order to be able to allege that any of her supervisors or co-workers dominated and controlled the corporate defendants, much like the individual defendant mentioned in the Mruz case who was alleged to have used the corporation for her own benefit. Having brought her claims without such an allegation of domination and control, Ms. Palladino should not be able to take advantage of waiting until discovery to re-raise an allegation which she should not have needed discovery to be able to allege. Therefore, Count II is dismissed as to the individual defendants with prejudice.

D. Count IIICEPA Liability

1. Whether CEPA is Preempted as a Matter of Federal Law

Defendants contend that Ms. Palladino's Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-5, claim is pre-empted by her federal claim under the FCA, 31 U.S.C. § 3730. Defendants claim precedent demonstrates that when a federal statute provides for a private right of action, state claims are preempted by the federal law. Defendants also assert that Congress intended for the FCA to preempt state law because Congress provided a comprehensive regulatory scheme to protect whistleblowers. Defendants offer a footnote from Adler v. Continental Ins. Co., No. 95-2282-EEO, 1996 WL 677085, at *10 n. 7 (D.Kan. Nov. 1, 1996), to support the belief that courts support the finding that the FCA preempts state whistle blowing statutes. This Court finds that, considering Congressional intent and decisions based on analogous federal statutes, the FCA does not preempt Ms. Palladino's CEPA claim.
State law is preempted by federal law in three circumstances. First, federal law preempts state law if Congress' intent to supplant the state law with a federal law is explicitly stated in the federal statute. See English v. General Electric Co., 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).
If no explicit statutory language exists, then "state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." Id. This can be implied if a pervasive regulatory scheme leaves no room for supplementation by state law or if a statute regulates a field dominated by the federal government. Id. However, the burden of proving that federal preemption is implied is heavy, for "[c]onsideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." Building and Constr. Trades Council v. Associated Builders and Contractors, 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993)(quoting Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). Thus, Congress' intent must be "clear and manifest." English, 496 U.S. at 79, 110 S.Ct. 2270.
The third category of preemption is when a state law conflicts with a federal law such that it is impossible to comply with both federal and state laws, id., or where state law poses as an obstacle to Congress' goals of the federal statute. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)(citing Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).
In Health Maintenance Org. v. Whitman, the Third Circuit stated that "[t]o determine Congress' intent, we begin with the text of the statute in question, and then move on to `the structure and purpose of the Act in which it occurs.'" Health Maintenance Org. v. Whitman, 72 F.3d 1123, 1127 (3d Cir.1995)(quoting New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins., Co., *466 514 U.S. 645, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695 (1995)). Therefore, this Court will analyze the FCA in accordance with the three categories of pre-emptive federal statutes. Then, we will address the defendants' assertion that precedents indicate that federal statutes providing for private actions inherently preempt state law.

a. The English Categories of Preemption

A federal statute preempts state law if preemption is expressly stated in the federal statute. For example, the Federal Employee Health Benefits Act ("FEHBA"), 5 U.S.C. § 8909 (1996), explicitly states that "[n]o tax, fee, or other monetary payment may be imposed ... by any State." 5 U.S.C. § 8909(f)(1) (1996); see also Health Maintenance Org. v. Whitman, 72 F.3d 1123, 1128 (3d Cir.1995). Congress indicated its intent that FEHBA preempt any state health plan by including an explicit provision in the statute. In the present case, however, there is no clear statutory language stating Congress' intent to preempt state law in this field.
A federal statute will also preempt state law if Congress implies preemption by creating a pervasive regulatory scheme or attempting to "take over a field." English, 496 U.S. at 79, 110 S.Ct. 2270. However, there is a presumption against preemption. See Trades Council, 507 U.S. at 224, 113 S.Ct. 1190. State law will be preempted only if it is Congress' "clear and manifest intent." English, 496 U.S. at 79, 110 S.Ct. 2270.
State law will not be preempted if it does not directly affect Congress' purpose for creating the statute. Todd v. Frank's Tong Serv., Inc., 784 P.2d 47 (Okla.1989), and California Div. of Labor Standards Enforcement v. Dillingham Constr., 519 U.S. 316, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997), both hold that state law is not preempted if it involves an area of law that is deeply rooted in local interests or traditionally regulated by the states. See Dillingham Constr., 519 U.S. at 330, 334, 117 S.Ct. 832; Todd, 784 P.2d at 49. Todd described two situations when state law may not be preempted by federal law in the absence of express statutory language: (1) if "there are unusually deeply-rooted local interests at stake" and (2) if "the conduct regulated by the state is, at best, one of peripheral concern to the federal law objectives." Todd, 784 P.2d at 49. This idea is furthered by English, which held that in order for a state law claim to be preempted, it must have a direct and substantial effect on Congress' purpose for the Act. See English, 496 U.S. at 85, 110 S.Ct. 2270. Moreover, state law is not preempted if it simply furthers the objectives of the federal law or imposes stricter standards. See Building and Constr. Trades Council, 507 U.S. at 230, 113 S.Ct. 1190; Silkwood, 464 U.S. at 257, 104 S.Ct. 615; Franklin Tower One v. N.M., 157 N.J. 602, 618, 619, 725 A.2d 1104 (1999); Todd, 784 P.2d at 50.
In the present case, CEPA furthers the objective of the federal law and represents an important state interest. The State has a substantial interest in regulating relations between its employers and employees. In addition, a state tort recovery statute for whistleblowers will further the federal interest of encouraging citizens to report fraud. The main purpose of the FCA is to recover money fraudulently gained from the government. See False Claims Amendments Act of 1986, S.Rep. No. 345, 99th Cong., 2d Sess., at 1 (1986). The purpose of including a whistleblowers protection clause is to induce people to report fraudulent claims. See S.Rep. No. 345, at 6. Affording both state and federal protection, which would allow double recovery, will certainly provide an incentive for individuals to come forward and report fraudulent claims to the government.
The fact that the whistleblowers protection clause of the FCA is peripheral to the main government objective of recovering money also weighs heavily in favor of not preempting the state law. In English, an *467 employee's state tort claim for intentional infliction of emotional distress was not preempted by the Energy Reorganization Act because the tort claim had no effect on safety regulations (i.e. the Act's purpose). See English, 496 U.S. at 81-87, 110 S.Ct. 2270. As in English, the state tort claim initiated by an employee for retaliation by her employer for "whistle blowing" is completely unrelated to and has no effect on the purpose of the FCA, prosecuting for fraudulent acts against the federal government. Hence, as in English, the plaintiff's state law claim under CEPA should not be preempted by federal law, the FCA.
Defendants offer legislative history as proof that Congress intended to enact § 3730(h) as a pervasive scheme to protect whistleblowers. (Def.'s Br. at 17.) The legislative history actually supports Ms. Palladino's position. The Judiciary Committee amended the FCA to include a whistleblowers protection provision to give whistleblowers "an opportunity to speak up and take action without fear." False Claims Amendments Act of 1986, S.Rep. No. 345, 99th Cong., 2d Sess., at 6 (1986). Having both state and federal protection would allay whistleblowers' fear of reporting fraud even more so than if only a federal protection were available. Since Congress' intent is to protect employees who report fraud, it seems more plausible that Congress would embrace a state law that provided whistleblowers additional protection, further encouraging the reporting of fraudulent acts; disallowing more extensive protection for whistleblowers would seem to undermine Congress' purpose. At the opening of the Congressional Hearings on the FCA's 1986 amendments, Mr. Berman stated that the qui tam provisions of the FCA are "essential to making the False Claims Act a more effective tool against" federal fraud. False Claims Act Amendments, Hearings Before the Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary, 99th Cong., 2d Sess. 95 (1986). Allowing both federal and state remedies for whistleblowers would be even more effective in increasing the likelihood of an employee reporting federal fraud, due to the more comprehensive protections provided.
Although Congress did not use language expressly permitting state tort claims, as in Title VII, see Sandom v. Travelers Mortgage Serv., Inc., 752 F.Supp. 1240, 1246 (D.N.J.1990), Congress has not indicated through the FCA's language that it intended to take over the field or provide a comprehensive scheme for remedying retaliation against whistleblowers. Nowhere does the FCA express an intent to protect wrongdoers from additional liability under state law. There is no language, like that in FEHBA, explicitly prohibiting states from creating particular laws. Section 3730(h) of the FCA provides whistleblowers with "all relief necessary to make the employee whole." 31 U.S.C.A. § 3730(h) (1999). It also entitles whistleblowers to reinstatement to the same position, "two times the back pay, interest on the back pay, and compensation for any special damages." Id. CEPA, on the other hand, also allows for injunctive relief and punitive damages. See N.J. Stat. Ann. § 34:19-5 (West 1999). Additionally, when a person brings a qui tam action under the FCA, the government can dismiss or settle the action without the consent of the individual who initiated the action, see 31 U.S.C.A. § 3730(c)(2)(A)-(B) (1999), which is not true of a CEPA claim.
Congress may have attempted to provide a remedy for citizens residing in states without any whistleblowers protection laws; however, that does not mean that Congress intended to take over the entire field. Granting minimal protections to a particular class of whistleblowers is far from a comprehensive, pervasive statutory scheme that should supercede a state's whistle blowing protection statute.
State laws can also be preempted by federal statutes if the state law requires an interpretation of the federal law. In a Ninth Circuit case, the Hawaii Whistle *468 Blower's Protection Act was preempted by a provision of the Employees Retirement Income Security Act ("ERISA"). See Hashimoto v. Bank of Hawaii, 999 F.2d 408, 412 (9th Cir.1993). Hashimoto held that the federal law preempted the state law because adjudication of the state law relied on an interpretation of ERISA. See id. at 411. Since the state law required that the employee know her report was not false, the state courts would have to determine if the employee had reasonably believed that a violation occurred. See id. This would force the state courts to interpret ERISA. See id.
The Supreme Court recognized this tenet in a similar case involving a collective bargaining agreement ("CBA") and the Railway Labor Act ("RLA"), 45 U.S.C.A. § 151 (1986). See Hawaiian Airlines v. Norris, 512 U.S. 246, 261, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). In Norris, the Court held that a state claim regarding a purely factual question that did not involve the interpretation of a CBA was not preempted. See id. If the claim had involved the interpretation of a term of the CBA, then the state claim would have been preempted by the RLA. See id.
Here, CEPA does not require the state courts to interpret the FCA. CEPA provides protection in a myriad of contexts, such that its reach is far broader than the FCA's concerns with protecting employees who expose conduct defrauding the federal government. To initiate a claim under CEPA, an employee only needs to prove that her employer retaliated against her for disclosing an act of the employer that the employee reasonably believes violates a state or federal law. See N.J. Stat. Ann. § 34:19-3 (West 1999). Unlike in Hashimoto, it is not necessary to interpret the FCA to determine if there has been a violation of CEPA. The FCA is a tool for prosecuting those who presented fraudulent claims against the federal government. See 31 U.S.C.A. § 3729 (1999). It is not essential to determine whether an employer attempted to defraud the government when deciding if an employer retaliated against an employee for whistle blowing. Thus, in this case, as in Norris, the federal law (FCA) should not preempt the state law (CEPA).
The final category of instances when federal law preempts state law is where the state law conflicts with the federal law so that it is impossible to comply with both the federal and state laws. Here, both parties concede that there is no conflict between the state and federal laws. Thus, this issue will not be discussed any further.
Defendants erroneously contend that the decision in Adler v. Continental Ins. Co., No. 95-2282-EEO, 1996 WL 677085 (D.Kan. Nov. 1, 1996), suggests that the FCA should preempt CEPA. However, the statement made in the footnote of that unpublished decision relies on two Kansas cases, Anco Constr. Co. v. Freeman, 236 Kan. 626, 693 P.2d 1183 (1985), and Chrisman v. Philips Indus., 242 Kan. 772, 751 P.2d 140 (1988), see Adler, 1996 WL 677085, at *10 n. 7, which were both decided in the 1980s prior to cases such as English. Chrisman does not support either defendants' or the Adler court's assertion because it holds, in conflict with English, that state law is preempted by the Energy Reorganization Act since the federal government occupies the entire field of nuclear energy safety regulation. See Chrisman, 242 Kan. at 780, 751 P.2d 140. Likewise, the Anco case is easily distinguishable because it deals with an element of an employment contract. This issue arises directly out of the National Labor Relations Act ("NLRA"), 29 U.S.C.A. § 151 (1998). See Anco, 236 Kan. at 630, 693 P.2d 1183. Thus solely federal law, and not state law, is applicable. See id. Therefore, Defendant's assertion that Adler suggests that the FCA preempts CEPA is unfounded.
In conclusion, the FCA does not preempt CEPA for all of the aforementioned reasons. The language and structure of the FCA do not indicate, either directly or indirectly, a "clear and manifest" *469 congressional intent to occupy the field of protecting whistleblowers. Nor does CEPA require an interpretation of the FCA. CEPA merely expresses the strong state interest in protecting whistleblowers and, in the process, furthers Congress' purpose by allowing for more extensive remedies for whistleblowers in New Jersey. Congress' purpose in attaching a whistleblowers provision to the FCA is to encourage reports of fraudulent acts against the government in order to recover losses resulting from such fraud. CEPA only addresses an issue peripheral to the government's purpose of regaining lost money. Therefore, Plaintiff's CEPA claim is not preempted by § 3730(h) of the FCA.

b. Precedents

Defendants contend that state tort claims are preempted by federal statutes that allow for private rights of action. However, such a broad statement is misguided. All case law cited by defendants is irrelevant or off-point.
First, defendants cite two cases that deal with the railroad, Rayner v. Smirl, 873 F.2d 60 (4th Cir.1989), and Mayon v. Southern Pac. Trans. Co., 805 F.2d 1250 (5th Cir.1986). These cases do not support Defendants' point because the basis for preempting the state law in favor of the federal statute was to promote national unity of the rail lines. See Rayner, 873 F.2d at 65. Furthermore, the Federal Employers' Liability Act ("FELA"), 45 U.S.C.A. § 51 (1986), the statute involved in Mayon, does not allow for private claims. See Mayon, 805 F.2d at 1252. These cases are not analogous to the case as hand because here, the goal of Congress was not to promote national unity of a commercial enterprise but to encourage citizens to report fraud victimizing the federal government and its taxpayers. See False Claims Amendments Act of 1986, S.Rep. No. 345, 99th Cong., 2d Sess., at 6 (1986). Preemption is based on congressional intent, Norris, 512 U.S. at 252, 114 S.Ct. 2239, and Congress did not have the same intent in the present case as in the two cases involving the railroad. As a result, the comparison between statutes is invalid.
The next two cases cited by the defendants are also inapplicable. In Marlow v. AMR Serv. Corp., a specific preemption clause in the Airline Deregulation Act preempted a state claim. See Marlow v. AMR Serv. Corp., 870 F.Supp. 295, 299 (D.Haw.1994). Preemption is not directly addressed by the court in Morgan v. Future Ford Sales because the plaintiff did not dispute the issue of preemption. See Morgan v. Future Ford Sales, 830 F.Supp. 807, 814 (D.Del.1993). Therefore, these cases also do not support the defendants' contention that where a federal private action exists, state law is pre-empted.
Defendants further claim that there also exists precedent to support the opposite contention, that where no private action exists, preemption is not found. (Def.'s Br. at 15.) The defendants propose three cases to support this claim. The first, Masters v. Daniel Int'l Corp., is not applicable because, upon remand, the Tenth Circuit did not provide an adequate explanation for its reasoning; it simply stated that, as suggested by the Supreme Court, state law is not pre-empted in light of English. See Masters v. Daniel Int'l Corp., 917 F.2d 455, 456 (10th Cir.1990). The last two cases which defendants cite, Pacheco v. Raytheon Co., 777 F.Supp. 1089 (D.R.I.1991), and Kozar v. AT & T, 923 F.Supp. 67 (D.N.J.1996), are relevant and applicable. However, two cases are insufficient to support defendants' alleged universal rule that state tort claims are not preempted when the federal law does not provide for private cause of action. Even assuming that state claims are not preempted if no federal private cause of action is exists, the converse is not necessarily true.
Defendants offer little support for their broad rule that, according to precedent, state law claims are preempted if there exists a private cause of action under the *470 federal statute. Thus, defendants' argument is unpersuasive.

2. Whether CEPA is Preempted as a Matter of State Law

Defendants assert that Ms. Palladino's CEPA claim is preempted as a matter of state law because Ms. Palladino also filed a federal claim based on the same set of occurrences. Defendants contend that, under New Jersey state law, a plaintiff waives the right to a cause of action under CEPA upon the filing of an overlapping federal claim, citing the following language:
Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under an other contract, collective bargaining agreement, State law, rule or regulation or under the common law.
N.J.S.A. 34:19-8.
In support of their interpretation of this provision, defendants cite to United States ex. rel. Mikes v. Straus, 853 F.Supp. 115, 120 (S.D.N.Y.1994), in which a district court interpreted a similarly worded section of the New York "whistleblower" statute to mean that a claim brought under would be incompatible with a parallel federal claim. Id. at 120. New York's waiver provisions reads:
... [I]nstitution of an action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule or regulation, or under the common law.
N.Y. McKinney's Labor Law § 740(7). The district court, while recognizing that a New York claim did not, and could not, preempt a federal claim, found that the state law preempted itself by implication when a plaintiff filed an overlapping federal claim. 853 F.Supp. at 120. The district court believed that such an interpretation was necessary to give effect to the purpose of the section to avoid overlapping claims. Id.
Defendants argue that this Court should adopt the New York district court's interpretation and reasoning because the language of the New York waiver provision is identical to that of the New Jersey statute. This Court disagrees. First, this Court notes that whether or not it finds the reasoning of the Southern District of New York persuasive, a decision by another district court, interpreting another state's law, is not binding upon us, and it is, of course, within this Court's discretion to adopt or reject similar reasoning. Second, the language of the two statutes is not identical, for the New York statute simply states that an action in accordance with the section shall be deemed a waiver of the rights and remedies available under any other "law" while the New Jersey statute specifically uses the words "state law." Third, this court finds the conclusion of Mikes to be unsupported and rejects its reasoning.
It is true that the purpose of the waiver provision in CEPA, like that in the New York statute, is to avoid overlapping lawsuits. The unambiguous language of the New Jersey provision indicates that by filing a claim under CEPA, a plaintiff waives his or her right to assert claims for the same conduct under contracts, collective bargaining agreements, state law, state rules, state regulations, or state common law. Nothing in that language states that the filing of a federal claim, or any other claim for that matter, implicitly waives the filing of a CEPA claim, and this Court finds that there is no reasonable basis upon which to extend the meaning of this section, beyond what it plainly states, to include waiver of the action brought under the state whistleblower law itself in the case of an overlapping federal claim. The New Jersey legislature could have *471 chosen to limit the reach of state remedies for whistleblowers to situations in which whistleblowers do not take advantage of the federal remedy,[4] but there is no statutory language which even suggests that it has so chosen. Indeed, there is no authority within New Jersey case law to indicate that the interpretation defendants propose reflects the intentions, explicit or otherwise, of the New Jersey State Legislature at all. In fact, defendant cites no other authority for that proposition because Mikes stands alone within the federal judiciary in its holding.
The unambiguous meaning of the language of N.J.S.A. 34:19-8 is that the institution of an action under it constitutes a waiver of other enumerated state law actions, not the reverse.
Accordingly, this Court declines to follow the Southern District of New York's reasoning and rejects defendants' argument that plaintiff's CEPA claim is preempted as a matter of state law.

3. Whether there is Individual Liability Under CEPA

This court next must determine an issue of first impression, namely, whether CEPA liability extends beyond plaintiff's employing entity to include persons who are other employees or supervisors acting with employer authorization. Defendants argue that the CEPA claim should be dismissed against the individual defendants because CEPA does not provide for individual liability of non-employers. CEPA holds employers liable for retaliation against employees, and it defines "employer" as thus:
any individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent....
N.J.S.A. 34:19-2(a). As Ms. Palladino points out, the plain language of this section is very broad and would include agents of the employer  such as supervisors and corporate officers  in the definition of employer. Defendants, however, contend that the phrase "any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent" does nothing more than make employers vicariously liable for the acts of their agents, and thus there is no individual liability (except for individual employers) under CEPA. No court has addressed this issue yet.
Nevertheless, defendants contend that the New Jersey Supreme Court's decision in Abbamont v. Piscataway Township Bd. of Education, 138 N.J. 405, 650 A.2d 958 (1994), compels a decision in their favor. The Abbamont case addressed the meaning of the word "consent" in the phrase "any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent." The New Jersey Supreme Court held that the requirement of "consent" simply reflects normal agency respondeat superior principles rather than the idea that employers can only be held liable for the actions of their employees if the employers specifically consent to the actions taken by their employees. Id. at 420-21, 650 A.2d 958. Defendants read this holding as meaning that the phrase "any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent" has no purpose other than to hold employers liable under normal agency principles  thereby excluding an interpretation of the phrase as allowing for individual liability against a supervisor.
*472 While the Abbamont case defined the scope of employer liability, it did not address the issue of individual employee liability; indeed, the only defendant was the plaintiff's true employer, the board of education. The New Jersey Supreme Court focused on defining the word "consent" and not the phrase in its entirety. The Abbamont decision had the effect of transforming the phrase "any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent" into "any agent of the employer." Thus, following the Abbamont decision, N.J.S.A. 34:19-2(a) could be read as holding both employers and the employers' agents liable for retaliation.
Defendants analogize to the case law surrounding two other statutes in support of their argument that there is no individual liability under CEPA, even if the Abbamont decision simply reduces the meaning of "any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent" to "or any agent of the employer." More specifically, defendants compare CEPA to the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; the former permits individual liability only for aiders and abettors, while the latter does not allow for individual liability. However, neither of these two statutes is analogous to CEPA in its definition of employer.
While the Supreme Court did state in Abbamont that the NJLAD standards for employer liability  meaning vicarious liability for the actions of the employer's agents  are analogous to CEPA's standards for employer liability, there is a crucial difference between the definitions of employers in the two statutes. NJLAD defines "employer" as "one or more individuals, partnerships, associations, organizations, labor organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and fiduciaries," N.J.S.A. 10:5-5(a), but it does not include the language "any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent." This is not, as defendants contend, a minor distinction, since it is the very inclusion of that language in CEPA which would create individual liability.
Title VII likewise is not analogous. Title VII defines employer as "a person engaged in an industry affecting commerce who has fifteen or more employees ... and any agent of such a person," 42 U.S.C. § 2000e-2(a), and the Third Circuit has interpreted the language "and any agent of," which is similar to the language of CEPA as interpreted in Abbamont, as doing nothing more than incorporating vicarious liability. Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1077 (3d Cir.1996) (en banc), cert. denied, 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). However, the Third Circuit's interpretation of the phrase "and any agent" in Title VII was based on the facts that Title VII specifically states that liability is for employers of fifteen or more employees, that the statute imposes a sliding scale of damages depending on the size of the employer, and that Congress "had previously expressed its concern about the impact of Title VII litigation on small businesses when it excluded businesses with fewer than fifteen employees from the definition of `employer.'" Id. at 1077-78. "This strongly suggests," said the Third Circuit, "that Congress did not contemplate that such damages would be assessed against individuals who are not themselves the employing entity." Id. CEPA, on the other hand, does not differentiate between sizes of employers, and the New Jersey Legislature has not similarly expressed concern for small employers that could be translated to concern for individuals.
Therefore, the "analogous" laws which exclude individual liability are not really analogous at all. Moreover, dicta and implications *473 from various other New Jersey Supreme Court and District of New Jersey cases support an interpretation of N.J.S.A. 34:19-2(a) which allows for individual liability.
In Young v. Schering Corp., 141 N.J. 16, 660 A.2d 1153 (1995), the New Jersey Supreme Court, looking to the scant legislative history and case law explaining CEPA, noted that the Legislature's intent in enacting CEPA was remedial, and therefore, CEPA should be construed liberally. Id. at 24-25, 660 A.2d 1153; accord, Barratt v. Cushman & Wakefield of New Jersey, Inc., 144 N.J. 120, 127, 675 A.2d 1094 (1996); Abbamont, supra, 138 N.J. at 431, 650 A.2d 958. The Young case focused on an interpretation of CEPA's waiver clause, N.J.S.A. 34:19-8, discussed infra, determining that once a CEPA claim has been instituted, all other contract, collective bargaining agreement, state law, state rule, state regulation, or state common law claims based on the same retaliatory discharge are barred. 141 N.J. at 29, 660 A.2d 1153.
In light of the fact that the Supreme Court in Young stated that the purpose of CEPA's waiver provision is to curtail essentially cumulative remedial actions, id. at 27, 660 A.2d 1153, if the definition of "employer" in CEPA was limited to actual employers, then whistleblowers presumably could still seek to recover from the individuals actually responsible for the retaliation through other means, such as state tort claims for intentional infliction of emotional distress or interference with business relations. If, on the other hand, the definition of "employer" is broad enough to include individual liability for agents of the employer, then the filing of a CEPA claim should act to bar other remedies against both the employer and its agents. Several cases indicate that the latter is correct.
In Lynch v. New Deal Delivery Service, Inc., 974 F.Supp. 441 (D.N.J.1997), the plaintiff claimed that she had been sexually harassed at work and filed claims under various provisions of New Jersey law against her employer and two of the company executives. Id. The Court found that the plaintiff's CEPA claims were barred by the statute of limitations. Id. at 455. Nonetheless, the district court found that, by filing her CEPA claims, the plaintiff waived her retaliatory discharge-based intentional infliction of emotional distress claims against all of the defendants, including the two individual company executives. Id. at 456. Similarly, in Boody v. Township of Cherry Hill, 997 F.Supp. 562 (D.N.J.1997), this Court dismissed claims against both an employer and individual defendants under various state tort provisions after the filing of time-barred CEPA claims against both the employer and the individuals. Id. at 568. The implications of these two cases are that CEPA's definition of employer is broad enough to encompass individual supervisor or other agent liability, for there is no indication that the Legislature intended to bar common law claims against individuals upon the filing of a CEPA claim if the CEPA claim cannot be properly filed against those individuals.
Moreover, a very recent New Jersey Supreme Court decision indicates that the Court may interpret the "employer" definition broadly enough to encompass the agent liability that is written into its plain language. See Higgins v. Pascack Valley Hospital, 158 N.J. 404, 730 A.2d 327 (N.J. 1999). In Higgins, the plaintiff sued her former employer and her former co-employees and supervisors for retaliatory behavior after she complained of illegal activity by her co-employees. Id. at 329. A jury reached a verdict holding the former employer liable. Id. at 330. Thereafter, the trial court dismissed the plaintiff's retaliation claims against her co-employees and supervisors, holding that there is no individual liability under CEPA. Id. at 416. On appeal, the Supreme Court did address the issue of whether an employer can be sued for retaliating against an employee who complains of the actions of other employees. *474 Id. at 424. However, despite the fact that the issue of individual liability under CEPA was squarely before it, the Court chose not to address the trial court's holding that there is no individual liability under CEPA, avoiding the issue by finding that, on the record before the Court, the facts would not support individual liability anyway. Id. Presumably the Supreme Court would not look to whether there was individual liability if the law did not allow for individual liability. At the very least, however, the Supreme Court's decision implies that Abbamont does not stand for the proposition that the phrase "any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent" has no purpose other than to impose vicarious liability on employer. The Supreme Court was clearly aware of its own Abbamont decision, having cited it at length in discussing whether the employer was liable, and, if the import of Abbamont is that there is respondeat superior liability but no individual agent liability, then the Supreme Court could have simply referred to it in upholding the trial court's reasoning. That the Supreme Court did not is telling.
Likewise, the structure of the remedial provisions of CEPA are consistent with individual liability. Under N.J.S.A. 34:19-5, the Legislature has assured that "[a]ll remedies available in common law tort actions shall be available to prevailing plaintiffs." Id. A tort remedy of compensatory damages, for example, is fully available from an individual, as are several of the possible enumerated remedies under § 34:19-5, including:
a. An injunction to restrain continued violation of this act;
. . . . .
d. The compensation for lost wages, benefits and other remuneration;
e. The payment by the employer of reasonable costs, and attorney's fees;
f. Punitive damages.
Id. Other enumerated remedies may logically be provided only by the employing entity, such as reinstatement to the same or equivalent position, § 34:19-5b, and reinstatement of full fringe benefits and seniority rights, § 34:19-5c. On balance, all CEPA remedies except reinstatement are logically as available from an individual agent as from the employing entity itself, and the imposition of individual liability for offending conduct furthers CEPA's protective and remedial purposes.
Therefore, because we are faced with a law that's plain language could support individual liability, because no case law directly on point states that there is not individual liability, because case law for other laws which do not allow for individual liability is not analogous, and because the implications of various New Jersey Supreme Court and District of New Jersey cases require a liberal reading of CEPA, this Court finds that CEPA creates individual liability for agents of the employer, including supervisory employees who act with the authorization of the employer. The defendants' motion to dismiss Ms. Palladino's CEPA claims against the individual defendants is denied.

E. Count IV  Defamation

1. Amended Complaint

Count IV of the Amended Complaint alleges that defendants Cooke, VNA, and VNSS defamed Ms. Palladino by telling third parties that she was terminated for cause and because she altered her driver's license, statements that were false and known to be false when made, injuring her professional reputation and causing her harm. (Amended Compl. ¶¶ 55-58.) Those defendants move to dismiss on the ground that Ms. Palladino's pleading lacks the required specificity under New Jersey State common law, which defines defamation as publication of false statements that injure the reputation of another. Maressa v. The New Jersey Monthly, 89 N.J. 176, 190, 445 A.2d 376 (1982). Further, a New Jersey complaint *475 alleging defamation must include three elements. They are "facts sufficient to identify the defamatory words, their utterer, and the fact of their publication." Printing Mart-Morristown v. Sharp Electronics, 116 N.J. 739, 767, 563 A.2d 31 (1989). Defendant cites numerous examples of New Jersey case law defining the specificity with which these elements must be pled.
However, while state law may define the general substance of the pleading for a claim based on state law, it does not govern the standard of pleading. Accordingly, the specificity with which a defamation claim brought in federal court must be pled is defined by Rule 8, Fed.R.Civ.P. See e.g., Mruz, 991 F.Supp. at 721 n. 29. Though some courts review allegations of defamation in a pleading under a more exacting standard, there are no special requirements for defamation actions under the federal rules. All that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. Rule 8(a)(2); see also, 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1245 at 308-10 (1990).
Under Rule 8, Fed.R.Civ.P., pleadings are to be liberally construed, and a pleading which gives notice to the defendant of the allegations made against him and the grounds upon which they are based is generally sufficient. See e.g., Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Crull v. Gem Ins. Co., 58 F.3d 1386 (9th Cir.1995); Barnhart v. Compugraphic Corporation, 936 F.2d 131, (3d Cir.1991); Maclin v. Paulson, 627 F.2d 83, (7th Cir.1980). There is no requirement to state facts specific enough to constitute a cause of action. See Schaedler v. Reading Eagle Pub., Inc., 370 F.2d 795 (3d Cir.1967). See also 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1215 at 137-9 (1990). The issue here, then, is whether Ms. Palladino's pleading alleges the elements of defamation as defined by New Jersey law to a degree of specificity sufficient to satisfy the standards, outlined above, of Rule 8, Fed.R.Civ.P.
In Count IV of her Amended Complaint, Ms. Palladino specifically identifies the allegedly defamatory statements, that she was terminated for cause and because she altered her driver's license, and submits that they were false.[5] She identifies the speakers as the defendants. Additionally, she alleges the fact of their publication, claiming that the statements were made verbally to third parties. Ms. Palladino seems to have made the necessary allegations to a degree of specificity which provides defendant with adequate notice of the cause of action against him, therefore satisfying the liberal pleading requirements of Rule 8.

2. Proposed Amendment

Ms. Palladino asks this Court for leave to amend the Amended Complaint to include additional and more specific allegations regarding Count IV. The proposed amendment alleges that defendant Cooke, Czoch, and VNA "have slandered and defamed Palladino by telling third parties that Defendants fired Palladino `for cause' and because she had a `fake' or `self-altered' license." (Proposed Amendment ¶ 3.) The proposal further alleges that at least several doctors were told VNA fired Ms. Palladino for having a false license, and that at least one of these doctors thought they may have meant her nursing license. (Id. at ¶¶ 4-10.) The proposed amendment also alleges that these statements were known by the defendants to be false when made, and that the statements hurt her professionally and emotionally. *476 (Id. at ¶¶ 11-12.)[6]
Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend his pleading once before a responsive pleading is served, or thereafter upon leave of court or upon consent from his adversary. Id. "[L]eave should be freely given when justice so provides." Id. The trial judge's decision as to the amendment will only be overturned for an abuse of discretion. Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 654 (3d Cir. 1998) (citing Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984)). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).
While the grant of leave to amend should not be automatic, see Dover v. Hartford Accident and Indemnity Co., 151 F.R.D. 570, 574 (E.D.Pa.1993), it should be granted absent a showing of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc." Foman, 371 U.S. at 182, 83 S.Ct. 227. The Third Circuit has set a liberal standard for amendment so that "a particular claim will be decided on the merits rather than on technicalities." Dole v. Arco Chemical Co., 921 F.2d 484, 486-87 (3d Cir.1990) (citing 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1471 (West 1990)).
Defendants here do not argue bad faith, unfair prejudice, or undue delay, but rather argue that leave to amend should be denied because the claims alleged in the proposed amendment, like those of the Amended Complaint, fail to state a claim upon which relief can be granted, thus making any amendment futile. See In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1434 (3d Cir.1997) (futility is judged by a Fed.R.Civ.P. 12(b)(6) standard). Defendants contend, for example, that the proposed amendment lacks specificity. However, given that this Court found the Amended Complaint to be specific enough and that this proposed amendment is more specific, this argument fails.
Defendants also argue that the allegations do not constitute slander as a matter of law because the statement regarding a "false license" was true and because any implication that defendants meant Ms. Palladino's nursing license is unreasonable. As to the former of these two contentions, the Court does not consider any allegation by the defendants that the statement was actually true; as this is a motion to dismiss, and not a summary judgment motion, all this Court can consider is that Ms. Palladino alleged that the statements were false, which is enough to satisfy her burden of alleging the elements of defamation. As to the latter of the two contentions, defendants are correct that in order to state a cause of action based on an implied meaning, a plaintiff must show that the statement is susceptible to a defamatory meaning, Ward v. Zelikovsky, 136 N.J. 516, 528, 643 A.2d 972 (1994), and such a special meaning of a derogatory nature must be pled by way of innuendo, explanation, or colloquium. Dorney v. Dairymen's League Co-op. Ass'n, Inc., 149 F.Supp. 615 (D.N.J.1957). This is a question of law to be decided by the court, which considers the content, verifiability, and context of the statements. Id. Here, the proposed amendment does provide an explanation, that, as a nurse, statements made by her former employers about her "license" could naturally be construed as referring to her nursing license, and Ms. Palladino specifically relates a factual allegation *477 of a third person who interpreted the "license" comment in that way. This court agrees with Ms. Palladino that in the context in which the statements were alleged to have been made, they were reasonably susceptible to the defamatory meaning alleged. Therefore, Ms. Palladino's proposed amendment to the Amended Complaint alleges all of the elements of defamation with a clearly sufficient degree of specificity; the proposed amendment would not be futile, and the Court will grant leave to amend as requested.

F. Count V  Plaintiff Keenan's Qui Tam Claim

Defendants argue that there are several grounds upon which this Court should dismiss Count V of the Amended Complaint, Ms. Keegan's qui tam claim under the False Claims Act, 31 U.S.C. § 3729(a). First, defendants argue, Ms. Keegan has not alleged a violation of § 3729(a) with the specificity required by Rule 9, Fed. R.Civ.P. Second, Count V contains no allegations regarding defendant Cooke, and thus Count V must be dismissed as to her. Third, they contend, Ms. Keegan's claims must be dismissed because, pursuant to § 3730(b)(5), only the government may bring a related action to that filed by the original relator, Ms. Palladino. Finally, defendants argue that Ms. Keegan lacks standing to bring her claim because she has not alleged injury-in-fact. Ms. Keegan seeks to amend the Amended Complaint in order to allege facts with more specificity.
As explained below, defendants are correct that, under § 3730(b)(5), only the government may bring this related action. Therefore, Count V of the Amended Complaint will be dismissed in its entirety, and the Court has no occasion to address either the other arguments in favor of dismissal or Ms. Keegan's motion to amend the Amended Complaint.
Section 3730(b)(5) of the False Claims Act provides:
When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.
31 U.S.C. § 3730(b)(5). The Third Circuit recently interpreted this language for the first time. See United States ex rel. LaCorte v. SmithKline Beecham Clinical Laboratories, Inc., 149 F.3d 227 (3d Cir. 1998).
LaCorte involved six suits filed under the qui tam provisions of the False Claims Act. Three separate parties filed qui tam actions against SmithKline, which operates a nationwide system of clinical laboratories, in different jurisdictions across the county, and all three of the "original" lawsuits were consolidated in the Eastern District of Pennsylvania. Id. at 231. All three of the original lawsuits claimed that SmithKline adopted "myriad complicated procedures for the purpose of defrauding state and federal healthcare programs, particularly Medicare and Medicaid. Most of these fraudulent schemes permitted SmithKline to bill the federal government for unauthorized and medically unnecessary laboratory tests." Id. The government negotiated a multi-million dollar settlement with SmithKline that could only be approved with the consent of the relators or by the court's determination that, notwithstanding the relators' objections, the settlement is fair. Id. However, before the settlement was executed, three new plaintiffs filed their own qui tam lawsuits against SmithKline in three different jurisdictions across the country. Id. These "later" lawsuits were also transferred to the Eastern District of Pennsylvania. Id. The district court determined that all but one of the "later" claims were included in the settlement agreement, but that because 31 U.S.C. § 3730(b)(5) bars the later-filed claims, the "later" qui tam plaintiffs were not entitled to share in the settlement proceeds. Id. On appeal, the "later" qui tam plaintiffs argued that they should share in the settlement proceeds because their claims differed from those of the "original" relators, and thus those claims *478 were not barred by § 3730(b)(5). Id. at 232. The Third Circuit disagreed, finding that § 3730(b)(5) did bar the "later" claims. Id.
The plaintiffs in LaCorte had argued that § 3730(b)(5) only bars claims that are identical to those stated by the original relator. Id. Because the "later" qui tam plaintiffs stated facts different from those stated by the "original" plaintiffs  indeed, they described events occurring at different offices of SmithKline in different regions of the country  their claims were not identical, and thus, they argued, their claims were not barred by § 3730(b)(5). The Third Circuit, however, "[g]iving each word its ordinary meaning," id., found that the phrase "related action based on the facts underlying the pending action" did not limit its bar to later cases based on precisely the same facts. Id. The statute, the Third Circuit said, bars "a later-filed action alleging the same elements of a fraud described in an earlier suit." Id. at 233. This is true "even if that claim incorporates somewhat different details." Id. at 232-233.
Not only is this interpretation consistent with the unambiguous wording of the statute, the Third Circuit said, but it is in line with the primary goal of the law. Id. at 234. It would be unfair and purposeless for later claimants "alleging the same material facts as prior relators [to] share in a qui tam award" because "such duplicative claims do not help reduce fraud or return funds to the federal fisc, since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." Id. Applying the law to the later-filed claims in the LaCorte case, the Third Circuit found that each of the later-filed suits was barred by § 3730(b)(5).
In the instant case, Ms. Keegan argues that the LaCorte decision is consistent with her view that § 3730(b)(5) does not bar her qui tam action because her claim is not of the parasitic type which the LaCorte court sought to prevent, for she has something new to present to the Court and to the government, while the plaintiffs in LaCorte did not. She contends that her claim is sufficiently different because she alleges that VNA and the other defendants are liable for violations of the False Claims Act because of events which took place in VNA's Runnemede, New Jersey office, while Ms. Palladino alleges that the defendants are liable because of actions which took place in the Philadelphia office. While the Court does not doubt Ms. Keenan's motives or that Ms. Keenan has additional details as to the scope of defendants' allegedly fraudulent practices which may aid Ms. Palladino as she pursues her claim against the defendants on behalf of the government, her argument is unavailing. The "later" qui tam plaintiffs in LaCorte, too, presented claims against the defendant for fraud based on facts wholly separate from those presented by the "original" plaintiff; indeed, the facts which each of those plaintiffs alleged came from a different SmithKline office, concerning different SmithKline employees, in different parts of the country. Nonetheless, the Third Circuit found that each of those claims was barred by the "original" plaintiffs' lawsuit, for while those lawsuits were based on different details, the allegations of the "original" plaintiffs' lawsuit were broad enough to encompass the claims made by the "later" plaintiffs. Id. at 235-238.
While the details of Ms. Palladino's qui tam complaint relate largely to the Philadelphia office, her allegation of fraud is against VNA and VNSS, both New Jersey corporations, and is by no means limited to the Philadelphia office. More specifically, Ms. Palladino states that "Defendants and/or VNSSJ submitted to the United States of America many requests for Medicare/Medicaid reimbursement which VNA knew to be false or fraudulent, and the United States of America paid for these claims." (Amended Compl. ¶ 36.) Her claim is broad enough to encompass Ms. Keenan's claim of billing abuse by VNA *479 and VNSS in Runnemede, Philadelphia, and other VNA/VNSS locations. (Id. at ¶ 73.) Therefore, Ms. Keenan's claim is barred by § 3730(b)(5), and it must be dismissed.

III. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the Amended Complaint will be granted in part, and Ms. Palladino's motion to amend the Amended Complaint will be granted. More specifically, defendant Cooke's motion to dismiss Count I of the Amended Complaint will be denied. All individual defendants' motion to dismiss Count II of the Amended Complaint with prejudice will be granted. All defendants' motion to dismiss Count III of the Amended Complaint will be denied. All defendants' motion to dismiss Count IV of the Amended Complaint will be denied. All defendants' motion to dismiss Count V of the Amended Complaint will be granted. Finally, Ms. Palladino's motion to amend Count IV of the Amended Complaint will be granted. Remaining in the case is Count I against all defendants, Count II against the VNA and VNSS, Count III against all defendants, and Count IV, as amended, against defendants VNA, VNSS, and Cooke. The accompanying Order is entered.

ORDER
This matter having come before the Court upon the motion of defendants VNA of Southern New Jersey, Inc. ("VNA"), Southern New Jersey Visiting Nurse Service System, Inc. ("VNSS"), Judy Demby, Julie Melendez, Christine McCullough, and Maryanne Czoch for partial dismissal of the Amended Complaint, upon defendant M. Kelly Cooke's separate motion to dismiss the Amended Complaint against her in its entirety, and upon plaintiff Joann Palladino's motion to amend Count IV of the Amended Complaint; and the Court having considered the parties' submissions as well as the amicus curiae brief by the United States; and for the reasons stated in an Opinion of today's date;
IT IS this day of June 1999 hereby
ORDERED that defendant Cooke's motion to dismiss the Amended Complaint against defendant Cooke in its entirety be, and hereby is, GRANTED IN PART AND DENIED IN PART, as follows: Counts I, III, and IV of the Amended Complaint shall not be dismissed, and Counts II and V of the Amended Complaint shall be dismissed against Cooke; and it is
ORDERED that the motion of defendants VNA, VNSS, Demby, Melendez, McCullough, and Czoch for partial dismissal of the Complaint be, and hereby is, GRANTED IN PART AND DENIED IN PART, as follows: defendants' motion to dismiss Count II against the individual defendants is GRANTED, defendants' motion to dismiss Count III is DENIED, defendants' motion to dismiss Count IV of the Amended Complaint is DENIED, and defendants' motion to dismiss Count V of the Amended Complaint shall be GRANTED; and it is
ORDERED that the plaintiffs' motion to amend Count IV of the Amended Complaint, be, and hereby is, GRANTED, and the Amended Complaint is deemed waived and plaintiffs shall file with the Court her Second Amended Complaint within ten (10) days hereof.
NOTES
[1] Wayne Whelan is no longer a defendant in the case.
[2] The government's Amended Complaint alleges claims against VNA under 31 U.S.C. §§ 3729(a)(1) and (2) for knowingly presenting a false or fraudulent claim and knowingly making use of a false record. The Complaint also alleges claims against VNA for common law fraud, payment under mistake of fact, and unjust enrichment. Defendants' motions to dismiss do not address the government's Amended Complaint, and this Opinion thus makes no findings with regard to the government's Complaint. In any case, the government's claims against VNA are substantially similar to Ms. Palladino's claim against VNA in Count I of her Amended Complaint, and VNA has not moved to dismiss that for failure to state a claim upon which relief may be granted.
[3] Plaintiffs argue that it is not necessary to allege the "time, place, and substance of the defendant's alleged conduct" in this Circuit, noting that the Third Circuit's statement merely stated the law of the Eleventh Circuit. Plaintiffs are correct that the language in LaCorte regarding the level of particularity required under Rule 9(b), Fed.R.Civ.P., was technically dicta. However, the Third Circuit relied upon the requirement of that level of particularity in reaching its ultimate holding. As discussed in Part II.F, the Third Circuit in LaCorte held that earlier-filed qui tam claims bar related later-filed qui tam claims. The plaintiffs in that case argued that such a rule would simply lead earlier relators to plead very broad causes of action in order to preempt later claims. 149 F.3d at 234. The Court rejected such a notion, finding that there was little risk of that because Rule 9(b) requires any relator to specify the time, place, and substance of the alleged conduct. Id. Therefore, while the statement was dicta, it was also not simply the statement of another Circuit's law.
[4] New Jersey could not state that by filing a CEPA claim, plaintiffs waive their right to take advantage of federal remedies, but New Jersey could state that the state remedies are unavailable if a federal claim is filed. The latter proposition would not impinge upon the supremacy of federal law, but rather would recognize a legislative decision as to when the state needs to provide a remedy. In any event, New Jersey has put no such limitation into place when a federal claim for similar relief is pending.
[5] Defendants allege in their briefs it is true that plaintiff's driver's license was expired and that truth is an absolute defense to defamation. However, this is a motion to dismiss, not a motion for summary judgment, and the Court does not consider such extraneous statements, whether made in a brief or in an affidavit or certification.
[6] The Court does note that by amending the Amended Complaint, Ms. Palladino has apparently given up her allegation that the defendants told third parties that she was fired for having a fake driver's license and that such a statement would be false.