Michael A. OBST, Respondent,

v.

MICROTRON, INC., et al., Appellants.

No. CX–98–798.

Court of Appeals of Minnesota.

Feb. 9, 1999.

Thomas P. Kane, David M. Wilk, Shannon B. Blair, Oppenheimer Wolff & Donnelly, LLP, St. Paul, for respondent.

Eric J. Magnuson, Daniel Q. Poretti, Brian Keith Jackson, Rider, Bennett, Egan & Arundel, LLP, Minneapolis, and Larry E. Reed, Hassan & Reed, Ltd., Minneapolis, for appellants.

Considered and decided by SHUMAKER, Presiding Judge, KALITOWSKI, Judge, and ANDERSON, Judge.

## OPINION

SHUMAKER, Judge.

Respondent Michael Obst brought an action against his former employer, appellant Microtron, Inc., and Microtron's vice president and general manager, Keith Horton, personally, contending that he had been subject to a retaliatory discharge in violation of Minn.Stat. § 181.932, subd. 1(a) (Supp.1997). He also charged that he had been defamed. After a trial, the jury found in favor of Obst, but awarded damages only on the whistleblower claim. The district court denied post-

trial motions, and Microtron and Horton appealed, raising only issues relating to the whistleblower claim. We reverse and deny Obst's motion for attorney fees.

## FACTS

Microtron, Inc. manufactures electronic components for the automotive industry, and sales to Ford Motor Company constitute a significant portion of its business. Beckwith Horton is the chief executive officer of Microtron. His son, Keith Horton (Horton), is Microtron's vice president and general manager who runs the day-to-day operations of the business. Michael Obst worked for Microtron as the quality assurance manager from March 1992 until he was fired in June 1995.

The primary electronic component that Microtron manufactures for Ford is the windshield wiper control module. In certain Ford vehicles, this module is used to control the windshield wiping and washing system. Microtron also manufactures a central timer module for Ford.

Before beginning the manufacture of the wiper control module in 1993, Ford worked with Microtron to develop an internal quality control plan that outlined each step in the manufacturing process. According to documents that Ford issued to Microtron, certain "control item parts," designated as such with an inverted triangle, "may affect safe vehicle operation and/or compliance with government regulations." The wiper control module is marked with an inverted triangle and is considered a safety item. Microtron was required to seek approval from Ford before revising the control plan for the modules through a process known as "supplier request for engineering approval."

The control plan called for testing the modules at certain points in the manufacturing process. Three different testers were used: the audit tester, the durability tester, and the end-of-the-line tester. It was undisputed at trial that the audit tester and the end-of-the-line tester performed the same tests on the module; they differed in that the end-of-the-line tester was capable of testing more units at once. As to the durability tester, Obst

explained it performed functions different from those of the end-of-the-line tester. Microtron witnesses explained that the durability tester checked the performance of the units over a longer period of time, but generally performed similar tests.

Microtron experienced several problems relating to the testing and manufacturing of the wiper control modules. First, since the start of production in 1993, the end-of-the-line tester broke down frequently and required repairs by technicians from Brazil. Second, in 1994, Ford engineers modified the design of the wiper control module, which brought certain components on the module's circuit board closer together. Microtron then had difficulty soldering the components onto the board without causing "bridging," or a short circuit, between the components. The short circuit could cause the module's operation to fail. After the redesign, testing during the manufacturing process detected an increase of defective modules.

Obst testified that on January 24, 1995, he learned that the end-of-the-line tester failed and that the audit tester was broken as well. The project manager proposed deviating from the control plan by using a durability tester in lieu of the end-of-the-line tester before shipping the product to the factories. Obst immediately reported this to general manager Horton. Obst informed Horton that use of the durability tester in place of the end-of-the-line tester was in violation of the control plan. Nevertheless, Horton ordered the process to continue and, according to Obst, Microtron then shipped the wiper control modules tested with only a durability tester but did not reveal this to Ford.

During this period, Ford plants reported a number of failures of the wiper control module. In late February, Obst called a meeting with Horton and others in which he discussed the problem and recommended solutions. Obst testified that he advised Microtron to reveal to Ford that the end-of-the-line and audit testers had not worked for a month and that product had been tested only with the durability tester. Obst contends that Horton instead required him to tell Ford that Microtron had first discovered a problem with the end-of-the-line tester on February 17, 1995. Other witnesses testified to different versions of events, including that the end-of-the-line tester had functioned intermittently during this period.

In a February 24 1995, letter, Microtron reported the manufacturing problem to Ford, explaining that it had learned the end-of-the-line tester may have allowed modules with solder shorts to pass. Microtron proposed short and long-term solutions, including using the durability tester to certify the modules pending repair of the end-of-the-line tester. It offered to submit a "supplier request for engineering approval" form if necessary. Ford's witnesses testified that Microtron's proposed use of the durability tester was an appropriate response to the testing problems.

In another incident, Obst asserted that on March 10, 1995, he audited the production of the central timer module to ensure compliance with its control plan. He found deviations from this control plan as well and reported them to Horton and others.

In early May 1995, Ford representatives reviewed Microtron's performance. Ford expressed concern as to the unusual number of unresolved complaints from the factories, which Microtron's quality assurance department should have resolved within 24 hours of receipt. Also of concern to Ford was Obst's lack of knowledge of this problem. Obst asserts that during this time he continued to warn Horton of the need to tell Ford about the events leading to the wiper control module failure. Obst testified that on May 18, 1995, he called Horton from a Ford factory to report the wiper control modules had failed a major audit.

Keith Horton told Obst on June 1, 1995, that he was fired. Microtron asserts it terminated his employment based on performance and communication problems, and at trial it presented testimony as to complaints about Obst's work from other employees and Ford. Obst contends his positive job performance reviews contradict that claim. He contends that Microtron fired him because he told Keith Horton that Microtron was not complying with Ford's control plan and because he insisted that Microtron should in-

form Ford of the events leading up to the complaints about the wiper control modules.

The jury found that Obst, in good faith, reported a suspected violation of law to Horton and Microtron and that he was terminated because of this report. It awarded damages. After the district court denied posttrial motions, Microtron and Horton brought this appeal.

## ISSUES

I. May a managerial employee be held personally liable in a retaliatory discharge action under Minn.Stat. § 181.932, subd. 1(a) (Supp.1997)?

II. Did the employee report in good faith a violation or a suspected violation of law?

## ANALYSIS

### Standard of Review

The district court's decision of whether to grant a new trial will not be disturbed unless it clearly abused its discretion. *Halla Nursery, Inc. v. Baumann-Furrie & Co.,* 454 N.W.2d 905, 910 (Minn.1990). When the district court bases its decision on a legal analysis, the appellate court will apply a de novo standard of review. *Id.* A decision to deny a motion for JNOV will be affirmed if there is any competent evidence reasonably tending to sustain the verdict. *Rettman v. City of Litchfield,* 354 N.W.2d 426, 429 (Minn.1984).

### I.

We first address the issue of whether a vice president and general manager of a corporation may be subject to personal liability under the whistleblower statute for firing an employee of the corporation. The district court concluded that Horton was personally liable because he met the definition of an employer. This was based on its findings that Horton had several employees, including Obst; that Horton personally reviewed Obst's performance, gave him merit raises, and personally fired him; and that Horton was the person to whom Obst reported his suspicions that Microtron possibly violated safety laws.

An appellate court will review de novo the legal issue of the construction of a statute. *Hedglin v. City of Willmar,* 582 N.W.2d 897, 901 (Minn.1998). In doing so, this court must "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (1996). If the statute is free from ambiguity, the reviewing court must apply its plain meaning. *State by Beaulieu v. RSJ, Inc.,* 552 N.W.2d 695, 701 (Minn.1996). A statute is ambiguous, however, "if it is reasonably susceptible to more than one interpretation." *Id.*

The whistleblower act prohibits an employer from engaging in a retaliatory discharge against an employee who, "in good faith, reports a violation or suspected violation of any federal or state law." Minn.Stat. § 181.932, subd. 1(a) (Supp.1997). Employer is defined as "any person having one or more employees in Minnesota and includes the state and any political subdivision of the state." Minn.Stat. § 181.931, subd. 3 (1996). On its face, the definition of employer in the whistleblower act does not explicitly include the employer's supervisors. *See id.*

The issue of whether an employee may be personally liable in these circumstances has not been directly addressed in Minnesota. *See Carter v. Peace Officers Standards & Training Bd.,* 558 N.W.2d 267, 272 n. 6 (Minn.App.1997) (noting in dictum that board chair not "employer" subject to individual whistleblower suit when responsible for firing employee). The question has been considered in the context of federal anti-discrimination statutes, which we look to for guidance. *See Sigurdson v. Isanti County,* 386 N.W.2d 715, 719 (Minn.1986) (noting that in analyzing cases under Minnesota Human Rights Act, principles developed in litigation of federal civil rights acts often apply due to substantial similarities).

Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees * * * and any agent of such a person * * *." 42 U.S.C. § 2000e(b). Despite the reference to agents in the definition of employer, a "growing consensus exists among the courts of appeals that employees cannot be held indi-

vidually liable under Title VII." *D.W. v. Radisson Plaza Hotel Rochester*, 958 F.Supp. 1368, 1375 (D.Minn.1997) (holding individual co-employees or supervisors may not be held liable under Title VII). One court explained that the "agent" language is used to incorporate the theory of respondeat superior, "rather than [to] expose either supervisors or co-workers to personal liability in employment discrimination cases." *Lenhardt v. Basic Inst. of Tech., Inc.*, 55 F.3d 377, 380 (8th Cir.1995) (considering state statute similar to Title VII).

Thus, in Title VII cases, which use a broader definition of employer than appears in the Minnesota whistleblower statute, courts have declined to find individual liability. *See United States ex rel. Lamar v. Burke*, 894 F.Supp. 1345, 1348 (E.D.Mo.1995) (using similar reasoning to find whistleblower provision of federal false claims act does not impose individual liability on corporate supervisors). Under the unambiguous language of the statute, the definition of employer in the Minnesota whistleblower act does not impose liability on individual supervisors.

## II.

The next issue is whether the district court properly denied a motion for a new trial or judgment notwithstanding the verdict on the issue of whether Obst showed a whistleblower violation as a matter of law.

 The three-part analysis set out by the supreme court in *McDonnell Douglas* applies to retaliatory discharge claims. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn.1983) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). First, to establish the prima facie case, the employee must establish

> (1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two.

*Hubbard*, 330 N.W.2d at 444; *Rothmeier v. Investment Advisers, Inc.*, 556 N.W.2d 590, 593 (Minn.App.1996) (applying standard to whistleblower case), *review denied* (Minn.

Feb. 26, 1997). Once a prima facie case is established, the employer has the burden of production to show a legitimate, nondiscriminatory reason for the discharge. *Hubbard*, 330 N.W.2d at 445. Finally, the employee may still prevail by demonstrating that the articulated reasons were pretextual or otherwise carrying the overall burden of persuasion. *Id.*

We focus here on the determinative issue of whether Obst established that he engaged in statutorily protected conduct as a matter of law by reporting a violation or suspected violation of law. Obst asserts that he reasonably believed that Microtron violated federal law. Obst contends that he had knowledge of the engineering specifications that Ford provided to Microtron for the manufacture of the modules. These specifications showed that the wiper control module was marked with an inverted triangle, indicating it was an item with critical characteristics that "may affect safe vehicle operation and/or compliance with government regulations."

He contends that Microtron is a manufacturer of "motor vehicle equipment," subject to federal regulation. *See* 49 U.S.C. § 30102(a)(5)(A) (1994) (defining manufacturer to include person manufacturing motor vehicle equipment). He contends the Motor Vehicle Safety Act prohibits manufacturers from selling or delivering defective motor vehicle equipment and provides guidelines for its recall. 49 U.S.C. § 30112(a) (1994) (prohibiting manufacture of motor vehicle equipment unless it complies with applicable motor vehicle safety standards); 49 U.S.C. § 30118(c) (providing for notice and remedy of defective or unsafe vehicles or equipment). Further, the federal regulations governing standards for windshield wiping and washing systems are applicable. 49 C.F.R. § 571.104 (Oct. 1, 1997) (providing technical requirements for windshield wiping and washing systems, including that each system must have at least two speeds or frequencies, and cover a certain percentage of the area of the windshield). Consequently, he contends that Microtron violated the Motor Vehicle Safety Act and the federal regulations.

In addressing this question, we first note that there is no issue as to the requirement

that there be a "good-faith" belief that the relevant facts occurred. *Hedglin,* 582 N.W.2d at 902 (holding that while fact questions may exist as to whether the relevant statutes were violated, it is irrelevant whether actual violations occurred due to good-faith requirement). Here, we consider whether the facts as alleged by Obst constitute a violation or suspected violation of law.[1]

*Hedglin* addressed a similar issue of whether particular conduct, if proven, would violate a law such that a report of the violation would constitute protected conduct under the whistleblower statute. *Hedglin,* 582 N.W.2d at 902 (addressing whistleblower claims based on reports of state law violations by firefighters). It analyzed the issue by setting out the particular conduct alleged and then determining whether the conduct would violate any state statute. It determined that falsifying rollcall sheets would implicate several specific criminal statutes concerning fraud and public employees and that the conduct of driving fire trucks while intoxicated would implicate drunk driving laws. *Id.* But a report of conduct involving firefighters who reported to work while intoxicated did not violate any state statute or rule, and thus complaints of such conduct would not be protected by the whistleblower statute. *Id.*

We employ a similar analysis here. The conduct reported here was Microtron's failure to follow Ford's internal control plan for the manufacture of the wiper control modules, in that it used a durability tester rather than an end-of-the-line tester. It is undisputed that Obst took great pains to ensure that the control plan was followed and that he was aware that the wiper control module was a safety item because it could implicate safety or federal regulations. But these facts do not mean that Microtron's failure to follow Ford's manufacturing control plan or to notify Ford of an alternative means of testing prior to employing it constituted a violation of federal law governing the standards for wiping and washing systems. The testing at issue here was not governed by the federal standards, which address the required frequencies or speed of the wipers and the area of the windshield to be wiped. 49 C.F.R. § 571.104. Further, Obst's reports continued even after Ford had been made aware of and accepted the substitute testing. As in *Hedglin,* 582 N.W.2d at 902, the reported conduct here did not violate any law and thus did not implicate the whistleblower act. In light of this determinative issue, it is not necessary to reach the other issues raised.

Obst moves for attorney fees and costs on appeal. Because Obst did not prevail, we deny the motion. *See McGrath v. TCF Bank Sav., FSB,* 502 N.W.2d 801, 809 (Minn.App. 1993) (holding that party who did not prevail not entitled to recover attorney fees and costs), *aff'd as modified,* 509 N.W.2d 365 (Minn.1993).

## DECISION

The district court erred as a matter of law in concluding Horton was personally liable under the whistleblower act and that Obst reported violations or suspected violations of law that would implicate the whistleblower act.

**Reversed; motion denied.**

---

1. The issue of whether the report raises public policy concerns was not raised in this case. *See Hedglin,* 582 N.W.2d at 903.