CABINET FOR FAMILIES AND CHIL-DREN;  Cary Willis;  Sharon Perry; and Viola Miller, Secretary, Appellants,

v.

Dr. Scott CUMMINGS;  Carol Garrison; and Nancy Martin, Appellees,

and

Dr. Carol Garrison;  and Dr. Nancy Martin, Appellants,

v.

Dr. Scott Cummings;  Cabinet for Families and Children;  Cary Willis;  Sharon Perry;  and Viola Miller, Appellees,

and

Dr. Scott Cummings, Appellant,

v.

Dr. Carol Garrison;  Cabinet for Families and Children;  Cary Willis;  Dr. Nancy Martin;  Sharon Perry;  and Viola Miller, Appellees.

No. 2002–SC–0788–DG, 2002–SC–0791–DG, 2003–SC–0456–DG.

Supreme Court of Kentucky.

May 19, 2005.

Jonathan Goldberg, Goldberg & Simpson, PSC, Jan M. West, Goldberg & Simpson, PSC, Louisville, Katherine A. Kingren, Cabinet for Families and Children, Office of the General Counsel, Nora K. McCormick, Cabinet for Families and Children, Frankfort, Counsel for Cabinet for Families and Children; Cary Willis; Sharon Perry; and Viola Miller, Secretary.

Priscilla S. Diamond, Louisville, Counsel for Dr. Scott Cummings.

David A. Friedman, National City Tower, Louisville, William B. Pettus, Assistant Attorney General, Civil and Environmental Law, Frankfort, Donna King Perry, Woodward, Hobson & Hobson, Elizabeth N. Monohan, Louisville, Counsel for Dr. Carol Garrison and Dr. Nancy Martin.

## OPINION OF THE COURT

In 1999, Dr. Scott Cummings ("Cummings") filed suit against the Cabinet for Families and Children ("the Cabinet"), individual employees of the Cabinet, Viola Miller, Sharon Perry and Cary Willis, as well as the University of Louisville ("the University"), and individual University employees, Dr. Garrison and Dr. Martin for violations of the Kentucky Whistleblower Act ("the Act"). The Jefferson County Circuit Court granted summary judgment to all defendants except the University, finding that (1) Cummings was not an employee of the Cabinet, and (2) the Act did not create a cause of action for individual liability. Cummings appealed to the

Court of Appeals, which reversed the trial court's dismissal of the underlying charges. We accepted discretionary review of all three cases and hereby affirm in part and reverse in part the decision of the Court of Appeals.

## FACTS

Prior to September 1999, Cummings was a tenured professor at the University. In addition, he was Director of the Center for Policy Research and Evaluation for the Urban Studies Institute ("the Institute") at the University. As such, he and another colleague sought to secure a grant for the study of welfare reform across the state by submitting a proposal titled "A Plan to Evaluate the Implementation and Impact of Welfare Reform in Kentucky" ("the Proposal") to the Cabinet. Soon thereafter, the Cabinet and the University's Institute entered into a Program Administration Contract ("the Contract"), which allotted approximately $500,000 annually to the Institute to create a database from which panel studies could be conducted in order to evaluate the impact of welfare reform in Kentucky. The Contract specifically incorporated Cummings's Proposal into the agreement, although Cummings himself did not sign the Contract.

Pursuant to the Contract, the Institute agreed to conduct panel studies, work in conjunction with the Cabinet to create appropriate indicators, submit invoices for requested payments at the end of each month, and provide information to the Cabinet upon request. The Institute was required to meet certain benchmarks for delivering reports (i.e., conduct phone surveys, provide preliminary findings, submit a project summary report, and provide the Cabinet with a bi-monthly narrative status report) unless otherwise approved by the Cabinet. Conversely, the Cabinet was to provide all requested information, and pro-vide consultation and technical assistance ("defining the requirements, analysis, detail specifications, coding, testing, debugging and implementation") to the Institute. The Cabinet was to also monitor all activities pursuant to the agreement. The Contract stated that the Cabinet disclaimed all liability for Social Security contributions relating to the compensation of the Institute.

In exchange for Cummings's work on the study, the Cabinet reimbursed the University one-third of Cummings's salary and fringe benefits during the fall and spring semesters and paid Cummings's full salary and fringe benefits during the summer. Cummings's teaching load at the University was reduced proportionately.

Cummings alleges that he was removed from his position on the study because he intended to disclose at a scheduled hearing before the Legislative Research Committee ("LRC") that welfare reform in Kentucky had a disparate impact upon African–American and Appalachian families. Cummings alleges that the Cabinet cancelled his appearance before the LRC and that the University, at the direction of the Cabinet, removed him from the study.

## STANDARD OF REVIEW

"The standard of review on appeal of a summary judgment is whether the circuit judge correctly found that there were no issues as to any material fact and that the moving party was entitled to a judgment as a matter of law." *Pearson ex rel. Trent v. Nat'l Feeding Systems, Inc.,* 90 S.W.3d 46, 49 (Ky.2002). Summary judgment is only proper when it would be impossible for the plaintiff to produce any evidence at trial warranting a judgment in his favor. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky.1991). In ruling on a motion for summary judgment, the court is required to construe the

record in a light most favorable to the party opposing the motion. *Id.* The proper question then becomes whether the trial court properly held as a matter of law (1) that Cummings was not an employee of the Cabinet, and (2) that the individual employees of the Cabinet and University were not liable under the Act.

## EMPLOYER/EMPLOYEE RELATIONSHIP

The Cabinet argues that Cummings was not an "employee" of the Cabinet. KRS 61.101(1) defines "employee" as follows:

(1) "Employee" means a person in the service of the Commonwealth of the Kentucky, or any of its political subdivisions, who is under contract of hire, express or implied, oral or written, where the Commonwealth, or any of its political subdivisions, has the power or right to control and direct the material details of work performance[.]

KRS 61.102 prohibits employers from subjecting public employees to reprisal for reporting information relating to the employer's violation of the law, alleged fraud, or abuse, etc. It is undisputed that the Cabinet is an "employer" under the Act, as it is a political subdivision of the Commonwealth. *See* KRS 61.101(2). However, the Cabinet alleges, and the trial court agreed, that since Cummings was not a party to the Contract between the University's Institute and the Cabinet, he was not an "employee" of the Cabinet for purposes of the Act.

The Cabinet directs us to *Stewart v. University of Louisville,* 65 S.W.3d 536 (Ky.App.2001), for guidance. In *Stewart,* the Court of Appeals found that a graduate student and recipient of a Regent's Fellowship, which provided for a yearly stipend for study, was not an "employee" of the University for purposes of Kentucky's discrimination statute (KRS 344.030) and KRS 61.102. The court held that although the graduate student received regular checks from the University, was required to submit reports to the University, and was not allowed to accept outside employment without the University's permission, the reality of the underlying relationship was not that of employer-employee. *Id.* at 539–540. Although suit was brought pursuant to KRS 61.102, as well as KRS 344.030, the Court of Appeals's analysis seemed to rely primarily on principles relating to KRS 344.030 and Title VII. *Id.* at 539 ("In determining whether an individual will be deemed an 'employee' for Title VII purposes, 'one must examine the economic realities underlying the relationship between the individual and the so-called principal in an effort to determine whether that individual is likely to be susceptible to the discriminatory practices which the act was designed to eliminate.'" (quoting *Armbruster v. Quinn,* 711 F.2d 1332, 1340 (6th Cir. 1983))). Nonetheless, *Stewart* is easily distinguishable from the current situation. The court there found that the majority of the graduate student's duties were in furtherance of her academic work, rather than in performance of services for the University; and therefore, the "economic realities" of the situation dictated that she was not an employee of the University. *Id.* at 540. In the current case, Cummings's duties and activities related to the study were clearly for the service of the Cabinet. In theory, the Cabinet was to use the findings of the study to present the LRC with an accurate picture of the effectiveness of the current welfare reform laws. In exchange for his work, the Cabinet paid a portion of Cummings's salary. The dynamics of the relationship in the case at bar are certainly different than those in *Stewart,* whose holding is best confined to its particular facts, and our

holding today is not inconsistent with the opinion in that case.

■ The trial court based its decision that Cummings was not an employee of the Cabinet on the fact that the only contract governing the study was between the Cabinet and the University. The court stated that although "Dr. Cummings may have obtained the contract for the University with the tacit understanding that he would perform the contract," the fact remained that he was not a party to the contract. We do not agree however, that the Contract entered into between the Cabinet and the University's Institute is the only governing document of the arrangement. The language of the Contract specifically delineates that the Institute is to perform certain enumerated services for the Cabinet. Section 1. p. of the Contract states that the Institute is to "[p]erform all of the services identified in the Second Party's [Institute's] proposal dated October 1997 and titled 'A PLAN TO EVALUATE THE IMPLEMENTATION AND IMPACT OF WELFARE REFORM IN KENTUCKY,' which is hereby incorporated into this agreement as if attached . . . ." That agreement was submitted and co-authored by Cummings and his name appears conspicuously throughout. The Proposal specifically identifies Cummings as "Director of the Center for Policy Research and Evaluation" and states that he will serve as "Co-principal Investigator" and "Co-chair of the Advisory Committee" for the study. The Proposal also contains the salary requirement of Cummings, and others chosen by him, in the annual budget. We believe by the express incorporation of Cummings's Proposal into the Contract between the Cabinet and the Institute, Cummings became a person "under contract of hire" with the Cabinet, a political subdivision of the Commonwealth of Kentucky. KRS 61.101(1). As such,

Cummings could be considered an employee of the Cabinet, for purposes of the Act, if the Cabinet "has the power or right to control and direct the material details of [Cummings's] work performance." *Id.*

Construing the evidence in the record in a light most favorable to Cummings, we must conclude that the trial court erred in granting the Cabinet summary judgment on this issue. The record shows that the Cabinet had the right to control and did control the details of Cummings's work on the study. The Contract itself states that the Cabinet would provide the database with which Cummings was to work. The Cabinet was permitted to add additional recipients to "supplement under-reported categories" in the panel if necessary; work in conjunction with the Institute to determine the appropriate indicators to study; provide consultation and technical assistance to the Institute; and monitor all activities pursuant to the Contract. Cummings was to report his findings to the Cabinet regularly. In addition, the Cabinet had control over what information was presented to other state agencies, the public, the media, and the Legislature. Cummings's affidavit alleges that the Cabinet dictated the specific details of the manner in which he was to draw the samples, create certain questionnaires, and analyze and interpret the data. Cummings further contends that he was not permitted to use his professional expertise in any of the determinations made, and that this manner of control by the Cabinet was not usually seen in this type of situation. Cummings states that he met regularly with Cabinet officials in person and via e-mail, regarding the progress of the research, and that several of his reports were extensively re-written by the Cabinet. Cummings also states that the Cabinet used a detailed "Gantt chart," which specified certain time lines and work product deadlines Cummings was required to

meet, as a tool to monitor the Institute's work on the study. The record also revealed copies of e-mails between Cummings and Cabinet employees where Cummings was specifically asked to remove the word "disparate" from his findings.

Also telling is that the Cabinet had enough control over Cummings's work that it was ultimately able to remove him from the study altogether. The Act's prohibition on retaliatory firing necessarily implies that an employer must be in a position to retaliate with the threat of one's job. This is a type of situation that we believe the General Assembly envisioned and sought to protect when it enacted the Act. Accordingly, we find that it was improper for the trial court to grant summary judgment to the Cabinet, as the Cabinet and Cummings exhibited the type of employer-employee relationship encompassed by the Act's provisions on whistleblowing.

### INDIVIDUAL LIABILITY

■ The trial court also granted summary judgment to the individual employees of the Cabinet and Drs. Martin and Garrison, Cummings's supervisors at the University, because it concluded that the Act did not create a cause of action against individuals. Whether the Act provides a cause of action against individuals is an issue of first impression for this Court.

Cummings argues that the plain language of the statute defines employer as including "any person" and therefore, the plain meaning rule of statutory construction dictates that we construe "person" according to its common usage and literal meaning. KRS 446.080(4); *Crenshaw v. Weinberg*, 805 S.W.2d 129, 133 (Ky.1991). Any other construction, according to Cummings, would render the second sentence in KRS 61.101(2) superfluous. Garrison and Martin, on the other hand, argue that

the term "person" is ambiguous and to apply the plain meaning rule would produce an absurd result. *Executive Branch Ethics Com'n v. Stephens*, 92 S.W.3d 69 (Ky.2002). Garrison and Martin contend that the second sentence in KRS 61.101(2) is present merely to incorporate a respondeat superior liability upon employers. We agree.

■ This Court has "a duty to accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion." *Bailey v. Reeves*, 662 S.W.2d 832, 834 (Ky.1984). Statutory interpretation is a matter of law and we are not required to give deference to the trial court's decision. *Commonwealth v. Plowman*, 86 S.W.3d 47, 49 (Ky. 2002). Our main objective is to construe the statute in accordance with its plain language and in order to effectuate the legislative intent. *Id.*

■ The definition of who is an "employer" under the Act is:

"Employer" means the Commonwealth of Kentucky or any of its political subdivisions. Employer also includes *any person authorized to act on behalf of the Commonwealth, or any of its political subdivisions*, with respect to formulation of policy or the supervision, in a managerial capacity, of subordinate employees.

KRS 61.101(2) (emphasis added). "[I]t is well-settled that 'in expounding a statute, we must not be guided by a single sentence or member of a sentence, but [must] look to the provisions of the whole law, and to its object and policy.'" *Wathen v. General Electric Co.*, 115 F.3d 400, 405 (6th Cir.1997) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987)); *Democratic Party of Kentucky v. Graham*, 976 S.W.2d 423, 429 (Ky.1998); *see Combs v. Hubb*

*Coal Corp.,* 934 S.W.2d 250, 252–253 (Ky. 1996); *Henry v. Commonwealth,* 312 Ky. 491, 493, 228 S.W.2d 32, 33 (1950).

In the penalty section of Kentucky's Whistleblower Act, the Legislature provided for criminal liability for individuals who willfully violate the Act, showing that the Legislature knew how to provide for individual civil liability for policy makers and managers if it had intended to do so. The fact that only the Commonwealth or one of its political subdivisions could grant much of the relief afforded by the Act, i.e., "reinstatement of the employee, the payment of back wages, full reinstatement of fringe benefits and seniority rights, exemplary or punitive damages, or any combination thereof," KRS 61.990(4), reinforces this Court's conclusion that the Legislature did not intend for policy makers and managers to be individually liable under the Act. *See Abbamont v. Piscataway Township Bd. of Education,* 138 N.J. 405, 650 A.2d 958, 964 (1994); *Alejandro v. Robstown Independent School District,* 131 S.W.3d 663, 668–669 (Tex.App.—Corpus Christi,2004). By providing that an aggrieved employee may be awarded "any combination" of the relief allowed under the Act, the Legislature clearly intended to afford an aggrieved employee all of the relief allowed under the Act. This purpose is defeated if an aggrieved employee could maintain an action solely against a policy maker or manager without joining the Commonwealth or a political subdivision as a party defendant.

■ In examining the "any person" language of the statute, one might argue that this language seems unnecessary or redundant because it was intended only as another way to bind the Commonwealth and its agencies. However, there is a very valid and logical reason for this language, which, indeed, binds the Commonwealth and its agencies for the acts of policy makers and managers. Under the common law, an employer is not liable for the torts committed by its employees acting outside the scope of their employment. *Roethke v. Sanger,* 68 S.W.3d 352, 361 (Ky.2001); *Osborne v. Payne,* 31 S.W.3d 911, 915 (Ky.2000); *Wood v. Southeastern Greyhound Lines,* 302 Ky. 110, 194 S.W.2d 81 (1946). Thus, without the Act's definition of "employer," the Commonwealth, itself, would have no liability to an aggrieved employee if it was determined that the policy maker or manager was acting outside the scope of his or her employment. But, under the Act, it is not an issue whether the policy maker or manager is acting outside his or her employment since a violation of the statute necessarily involves the exercise of managerial or policy making authority. Thus, the Commonwealth or its agencies are per se liable for the acts of a policy maker or manager in violation of the statute, and the purpose of the second sentence is not only to ensure that the Commonwealth or its agency will be held liable if their policy makers and managers take actions later to be found a violation of the Act, but also to ensure that the Commonwealth or its agency cannot avoid liability by arguing that a policy maker or manager acted outside the scope of his or her employment.

In interpreting similar definitions of "employer" contained in parallel federal acts and whistleblower acts of other states, "a majority of circuits have found *no* individual liability." Title VII (42 U.S.C.A. §§ 2000e *et seq.*); ADEA (29 U.S.C.A. §§ 621 *et seq.*); ADA (U.S.C.A. §§ 12101 *et seq.*); *Lococo v. Barger,* 958 F.Supp. 290, 295 (E.D.Ky.1997), *aff'd in part, rev'd in part, on other grounds by* 234 F.3d 1268 (6th Cir.2000). In fact, "a growing consensus exists among the courts" that "the 'agent' language is used to incorporate the theory of respondeat superior, 'rather than [to] expose either supervisors or co-work-

ers to personal liability in employment discrimination cases.'" *Obst v. Microtron, Inc.*, 588 N.W.2d 550, 553, 554 (Minn.Ct. App.1999), *aff'd by* 614 N.W.2d 196 (Minn. 2000) (citing *D.W. v. Radisson Plaza Hotel Rochester*, 958 F.Supp. 1368, 1375 (D.Minn.1997); citing *Lenhardt v. Basic Institute of Technology, Inc.*, 55 F.3d 377, 380 (8th Cir.1995)); *see Wathen v. General Electric Co.*, 115 F.3d 400, 406 (6th Cir. 1997).

Although in *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir.2000) the United States Court of Appeals for the Sixth Circuit discredited its previous use of the definition of employer contained in Title VII, *Morris* concerned a different statute (KRS 344.280) than the one in question here, and has no bearing on the interpretation of KRS 61.101(2). *Morris*, which rejected reference to Title VII, was concerned with Kentucky's Civil Rights Act, which expressly provides that "a person, or ... two (2) or more persons" are liable for a violation of this Act, and defines a person to include, inter alia, an individual, a partnership, a corporation, or the Commonwealth, but not an agent. KRS 344.280 (emphasis added). However, in both the Kentucky Whistleblower Act and Title VII, the Commonwealth or the company *and any agent or person authorized to act on its behalf* are held liable. KRS 61.101(2) ("*any person authorized to act on behalf of the Commonwealth ...* with respect to formulation of policy or the supervision, in a managerial capacity, of subordinate employees" (emphasis added)); 42 U.S.C.A. § 2000e(b) ("*a person engaged in an industry* affecting commerce ... *and any agent of such person*" (emphasis added)).

■ Accordingly, since KRS 61.101(2) and Title VII share references to agents, while the Kentucky Civil Rights Act does not, Title VII's definition is more analogous to the definition in Kentucky's Whistleblower Act than is the definition contained in Kentucky's Civil Rights Act. Thus, cases interpreting Title VII's definition of employer, as well as the definitions contained in the ADEA, 29 U.S.C.A. § 630(b) ("'[E]mployer' means a person engaged in an industry affecting commerce ... [and] any agent of such person."), and the ADA, 42 U.S.C.A. § 12111(5)(A) ("'[E]mployer' means a person engaged in an industry affecting commerce ... and any agent of such person."), are helpful and applicable in determining the scope of similar language in Kentucky's Whistleblower Act because "'all the definitions of employer in these statutes are worded to cover the "agent" of the employer.'" *Reno v. Baird*, 18 Cal.4th 640, 76 Cal. Rptr.2d 499, 957 P.2d 1333, 1337 (1998) (citing *Janken v. GM·Hughes Electronics*, 46 Cal.App.4th 55, 53 Cal.Rptr.2d 741, 748 (1996)).

"Many courts have found that ... the definition of 'employer' serves to establish an employer's respondeat superior liability, rather than personal liability for company employees." Shannon Clark Kief, Annotation, *Individual Liability of Supervisors, Managers, Officers or Co-employees for Discriminatory Actions Under State Civil Rights Act*, 83 A.L.R.5th 1 § 2(a) (2004).

> [S]ince 1993, eight federal circuits have either (1) held that the "agent" language does not create individual liability for discrimination, or (2) found that, although individuals can be sued in their official or representative capacity, they may not be sued in their individual capacity and have no personal liability, or (3) interpreted similar language in a state statute as not creating individual liability.

*Reno,* 76 Cal.Rptr.2d 499, 957 P.2d at 1337. In addition, other federal district courts and state courts have reviewed this issue and have determined that their respective whistleblower schemes did not create individual liability for supervisors. *United States ex rel. Lamar v. Burke,* 894 F.Supp. 1345 (E.D.Mo.1995) (holding that since Title VII's definition was broader and yet did not impose individual liability on supervisors, the narrower, ordinary and natural meaning of employer for purposes of the False Claims Act did not impose individual liability on employee/supervisors); *Palladino v. VNA of Southern New Jersey, Inc.,* 68 F.Supp.2d 455 (D.N.J.1999) (holding that corporate officers and supervisors were not subject to individual liability under the federal False Claims Act because the Act prohibited discrimination with respect to employment conditions and only an employer could logically grant the relief made available); *Reno v. Baird,* 18 Cal.4th 640, 76 Cal.Rptr.2d 499, 957 P.2d 1333, 1337 (1998) (citing *Janken v. GM Hughes Electronics,* 46 Cal.App.4th 55, 53 Cal. Rptr.2d 741, 747 (1996)) (rejecting individual liability and stating the agent language was intended to " 'ensure that employers will be held liable if their supervisory employees take actions later to be found discriminatory, and that employers cannot avoid liability by arguing that a supervisor failed to follow instructions or deviated from the employer's policy" '); *Obst v. Microton, Inc.,* 588 N.W.2d 550 (Minn.Ct. App.1999) (declining to hold individuals liable under Minnesota's whistleblower statute); *Alejandro v. Robstown Independent School District,* 131 S.W.3d 663, 668 (Tex. Ct.App.2004) (holding that there is no private right of action against the superintendent or members of the board of trustees in their individual capacities because the "Act creates a private cause of action against the employing 'state or local governmental entity" '). For example, in *Abamont v. Piscataway Township Board of Education,* 138 N.J. 405, 650 A.2d 958 (1994) the New Jersey Supreme Court rejected individual liability under its Whistleblower provisions, which contained a definition of employer similar to the definition in Kentucky's Act. *Id.* at 963 (Under the New Jersey Act, "an employer can be 'any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent." ' (citation omitted)). The Court noted that the employer was the " 'party with the power and responsibility ... to take ... remedial action" ' under the statute and "that to fulfill the remedial purposes of ... [the Act], employers should be strictly liable for equitable relief in the nature of reinstatement, restoration of back pay and the like." *Id.* at 964 (citation omitted).

The Kentucky Whistleblower Act, as a whole, is inconsistent with individual liability. It imposes civil liability on the Commonwealth and its agencies for actions of policy makers and managers, while the individual policy makers and managers face only criminal liability for willful violations of the Act. Had the Legislature wanted to impose individual civil liability on policy makers and managers it could have done so. As it stands, however, the criminal liability provision works in connection with respondeat superior liability because it provides a punishment for those who would otherwise escape civil liability. Since the statutory scheme provides no avenue for suits against policy makers and managers in their individual capacity (only criminal prosecutions), punitive damages cannot be collected from individuals and the inclusion of punitive damages as an available remedy does not impose or indicate an intention to hold them individually liable.

Accordingly, the language of KRS 61.101(2) does not impose individual civil liability under Kentucky's Whistleblower Act for reprisal against public employees of the Commonwealth and its political subdivisions.

## CONCLUSION

For the foregoing reasons, the Court of Appeals's decision is affirmed in part, and reversed in part and the Jefferson Circuit Court's grant of summary judgment in favor of the individual employees Miller, Perry, and Willis, and Drs. Garrison and Martin, is hereby affirmed, and the grant of summary judgment in favor of the Cabinet is hereby reversed and remanded for further proceedings consistent with this opinion.

LAMBERT, C.J.; GRAVES, JOHNSTONE, KELLER, SCOTT and WINTERSHEIMER, JJ., concur.

COOPER, J., concurs in part and dissents in part by separate opinion.

Opinion by Justice COOPER, Concurring in Part and Dissenting in Part.

I concur in the majority opinion's conclusion that Dr. Cummings was an "employee" of the Cabinet for Families and Children as that term is defined in KRS 61.101(1). However, I dissent from the majority opinion's conclusion that individual policy-makers and managerial supervisors of so-called "whistleblowers" are not included within the definition of "employer" as that term is defined in KRS 61.101(2). The statutory language pertinent to this issue is as follows:

**KRS 61.101.**

. . .

(2) "Employer" means the Commonwealth of Kentucky or any of its political subdivisions. *Employer also includes any person authorized to act*

*on behalf of the Commonwealth, or any of its political subdivisions with respect to formulation of policy or the supervision, in a managerial capacity, of subordinate employees;*

. . .

**KRS 61.102.**

(1) *No employer* shall subject to reprisal . . . any employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of . . . any . . . appropriate body or authority, any facts or information relative to an actual or suspected violation of any law, statute, executive order, administrative regulation, mandate, rule, or ordinance . . . or any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority, or a substantial and specific danger to public health or safety.

. . .

**KRS 61.103.**

. . .

(2) Notwithstanding the administrative remedies granted by KRS Chapters 16, 18A, 78, 90, 95, 156, and other chapters of the Kentucky Revised Statutes, employees alleging a violation of KRS 61.102(1) or (2) may bring a civil action for appropriate injunctive relief or punitive damages, or both, within ninety (90) days after the occurrence of the alleged violation. *The action may be filed in the Circuit Court for* the county where the alleged violation occurred, the county where the complainant resides, or *the county where the person against whom the civil complaint is filed resides* or has his principal place of business.

KRS 61.990.

    (3) Any *person* who willfully violates the provisions of KRS 61.102(1) shall be guilty of a Class A misdemeanor.

(Emphasis added.)

Nothing could be more obvious from the plain language of this statutory scheme than the intent of the General Assembly to make its provisions applicable not only to the Commonwealth and its political subdivisions but also to "person(s)" occupying policy-making or supervisory positions with respect to the offended employee. The majority opinion concludes, however, that the "any person" language of KRS 61.101(2) only creates vicarious liability in the Commonwealth for the actions of its policy-making or supervisory employees. But if so, why establish as a venue for the civil action authorized by KRS 61.103(2) "the county where the *person* against whom the civil complaint is filed *resides* "? The majority opinion concedes that KRS 61.990(3) imposes criminal liability on "individuals" who willfully violate the act. *Ante*, at —— , —— (slip op. at 10, 15). Yet, only "employers" can violate KRS 61.102(1), and the majority holds that the only "employers" under the Act are the Commonwealth and its political subdivisions. Of course, the Commonwealth and its political subdivisions are not subject to criminal penalties—only "persons" and "corporations" can be convicted of Class A misdemeanors. KRS 532.030(3), .090(1); KRS 534.040(2), .050(1)(b).

"It is a general rule of law that statutes which are remedial in nature are entitled to a liberal construction in favor of the remedy provided by law, or in favor of those entitled to the benefits of the statute." *Ky. Ins. Guar. Ass'n v. Jeffers ex rel. Jeffers*, 13 S.W.3d 606, 611 (Ky.2000) (quoting 73 Am.Jur.2d *Statutes*, § 278 (1974)). Whistleblower acts are remedial in nature. *See, e.g., Martin County v.*

*Edenfield,* 609 So.2d 27, 29 (Fla.1992) ("As a remedial act, the [whistleblower] statute should be construed liberally in favor of granting access to the remedy."); *Chandler v. Dowell Schlumberger Inc.,* 456 Mich. 395, 572 N.W.2d 210, 215 (1998) ("The WPA [Whistleblower Protection Act], as a remedial statute, is to be liberally construed to favor the persons the Legislature intended to benefit."); *Scott v. Godwin,* 147 S.W.3d 609, 621 (Tex.Ct.App. 2004) ("Because the Whistleblower Act is remedial in nature, it should be liberally construed to effect its purpose."). Furthermore:

> "We have a duty to accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion."

*Crenshaw v. Weinberg,* 805 S.W.2d 129, 133 (Ky.1991) (quoting *Bailey v. Reeves,* 662 S.W.2d 832, 834 (Ky.1984)). The majority opinion concludes that it would be absurd and wholly unreasonable to interpret this Act as holding a wrongdoer responsible for his/her own wrongdoing. I conclude that it is absurd and wholly unreasonable not to do so.

> [O]ne can increase the likelihood of individual deterrence by increasing the scope of possible personal liability in whistleblower actions. In addition, the law should mandate that the potential fine may not be paid by the employing governmental body but must be paid by the individual responsible.

Valerie P. Kirk & Ann Clarke Snell, *The Texas Whistleblower Act: Time for a Change,* 26 Tex. Tech L.Rev. 75, 94–95 (1995). *Cf. Degener v. Hall Contracting Corp.,* 27 S.W.3d 775, 781–82 (Ky.2000) (recognizing employer's right of indemnity against employee for damages payable to third party because of employee's violation of Kentucky Civil Rights Act). Our statu-

tory scheme, unlike Texas's, accomplishes both of those goals.

The majority opinion primarily relies on cases interpreting the definitions of "employer" in Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Age Discrimination in Employment Act ("ADEA"). Title VII defines employer as "a person . . . who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. § 2000e(b). The ADA defines employer as "a person . . . who has 15 or more employees . . . and any agent of such person." 42 U.S.C. § 12111(5)(A). The ADEA defines employer as "a person . . . who has twenty or more employees" including "any agent of such a person." 29 U.S.C. § 630(b). As stated in the majority opinion, most courts that have construed these statutes have construed the "any agent" language as creating only vicarious liability, i.e., agency liability, in the employers but not individual liability in the agent. E.g., Wathen v. Gen. Elec. Co., 115 F.3d 400, 405 (6th Cir.1997) (Title VII); Tomka v. Seiler Corp., 66 F.3d 1295, 1313–17 (2d Cir.1995) (Title VII); U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1281–82 (7th Cir.1995) (ADA); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 510–11 (4th Cir.1994) (ADEA); Miller v. Maxwell's Int'l Inc., 991 F.2d 583, 587–88 (9th Cir.1993) (Title VII).

Obviously, the phrase "any agent" is substantially broader in scope than "any person authorized to act . . . with respect to formulation of policy or the supervision, in a managerial capacity, of subordinate employees." KRS 61.101(2). In addition to emphasizing the "any agent" phrase, the courts interpreting Title VII, the ADA, and the ADEA, have emphasized the fact that the statutes limit liability to employers with a specified minimum number of employees "in part because Congress did

not want to burden small entities with the costs associated with litigating discrimination claims," Miller, 991 F.2d at 587; and it is " 'inconceivable' that a Congress concerned with protecting small employers would simultaneously allow civil liability to run against individual employees." Tomka, 66 F.3d at 1314. Additionally, the legislative history indicates that in the floor debates over Title VII, no mention was made of agent liability, further "implying that Congress did not contemplate agent liability under Title VII." Id. Finally, before Congress enacted the Civil Rights Act of 1991, 42 U.S.C. § 1981a, the remedies for a successful Title VII claim were limited to reinstatement and back pay— remedies available only from an employer. Id. The Civil Rights Act of 1991 added compensatory and punitive damages for intentional discrimination under Title VII, remedies available from individuals as well. However, Congress calibrated the amounts of damages recoverable to the size of the employer, beginning with employers having at least fifteen employees. 42 U.S.C. § 1981a(b)(3). "[I]f Congress had envisioned individual liability . . . it would have included individuals in this litany of limitations and would have discontinued the exemption for small employers . . . ." Miller, 991 F.2d at 588 n. 2.

In Wathen v. General Electric Co., the United States Court of Appeals for the Sixth Circuit noted that Kentucky courts look to the federal counterpart when construing the Kentucky Civil Rights Act, 115 F.3d at 403 n. 5, thus construed KRS 344.030(2) the same as it construed Title VII, i.e., as creating no individual liability. Id. at 405. Similar to Title VII, the ADA, and the ADEA, KRS 344.030(2) defines "employer" as "a person who has eight (8) or more employees . . . and an agent of such a person . . . ." However, none of the considerations applicable to Title VII, the ADA, the ADEA, and KRS 344.030(2) ap-

ply to the statutory scheme of the Whistleblower Act. The word "agent" does not appear in KRS 61.101(2), which limits individual liability to policy-making, supervisory, and managerial employees—those in a position to retaliate against a whistleblower. Nor is the Whistleblower Act limited to employers with a specified minimum number of employees. There is no "calibration" of the amount of damages according to the number of employees. Although only an employer can reinstate a "whistleblower," an individual obviously can pay punitive damages. Finally, there is no legislative history indicating a legislative intent that the Act means something other than what it clearly says.

Significantly, since deciding *Wathen*, the Sixth Circuit has held that KRS 344.280, the statute creating a cause of action for retaliation under the Kentucky Civil Rights Act, *does* create individual liability for supervisors and other employees. *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 793–94 (6th Cir.2000). That statute provides that "[i]t shall be an unlawful practice for a *person* ... [t]o retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter ...." (Emphasis added.) Like KRS 344.280, the Whistleblower Act protects employees against retaliation for lawful conduct. The only difference between KRS 344.280 and KRS 61.101(2) is that the former refers to a "person" and the latter refers to a "person" who is a policy-maker, supervisor, or manager.

The other authorities cited in the majority opinion are also easily distinguished. *Obst v. Microtron, Inc.,* 588 N.W.2d 550 (Minn.Ct.App.1999), *aff'd,* 614 N.W.2d 196 (Minn.2000), construed a statute, Minn. Stat. § 181.931, subd. 3, that defined "employer" as "any person having one or more employees in Minnesota and includes the state and any political subdivision of the state," and contained no reference to either agents or persons acting on behalf of the employer. 588 N.W.2d at 553–54. *Reno v. Baird,* 18 Cal.4th 640, 76 Cal. Rptr.2d 499, 957 P.2d 1333 (1998), construed a statute, Cal. Govt.Code § 12926, subd. (d), that, similar to Title VII, the ADA, and the ADEA, defined an "employer" as "any person regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly ...." 76 Cal.Rptr.2d 499, 957 P.2d at 1335. *United States ex rel. Lamar v. Burke,* 894 F.Supp. 1345 (E.D.Mo.1995), construed 31 U.S.C. §§ 3729–3733, the False Claims Act, which contains no definition of "employer." "The statute in this case does not define 'employer.' Therefore, this Court should construe 'employer' in accord with its ordinary and natural meaning." *Id.* at 1347. The court proceeded to consult various dictionaries. *Alejandro v. Robstown Independent School District,* 131 S.W.3d 663 (Tex.Ct.App. 2004), construed a statute, Tex. Gov't Code Ann. § 554.008(e), that specifically limited a supervisor's liability to a civil penalty not to exceed $15,000.00, payable to the state treasury. 131 S.W.3d at 668–69.

*Abbamont v. Piscataway Township Board of Education,* 138 N.J. 405, 650 A.2d 958 (1994), construed New Jersey's whistleblower act, the Conscientious Employee Protection Act (CEPA), which defined "employer" as "any individual, partnership, association, corporation *or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent* ...." N.J. Stat. Ann. 34:19–2(a) (emphasis added). However, the whistleblower in *Abbamont* did not sue his supervisor and the court did not address whether a supervisor could be held individually liable under the definition of "employer." It only decided that the Board of Education

was vicariously liable for the retaliatory actions taken by the supervisor. *Id.* at 965–66. In *Palladino ex rel. United States v. VNA of Southern New Jersey, Inc.* 68 F.Supp.2d 455 (D.N.J.,1999), a federal district court construing that same statute held that it created individual liability for supervisory employees acting with the authorization of the employer. *Id.* at 474. Similarly, in *Alaska Housing Finance Corp. v. Salvucci,* 950 P.2d 1116 (Alaska 1997), the Supreme Court of Alaska interpreted the following whistleblower statute as authorizing actions against individuals as well as employers:

**Sec. 39.90.120   Relief and penalties.**

(a) A person who alleges a violation of AS 39.90.100 may bring a civil action and the court may grant appropriate relief, including punitive damages.

(b) A person who violates or attempts to violate AS 39.90.100 is also liable for a civil fine of not more than $10,000. The attorney general may enforce this subsection.

(c) A person who attempts to prevent another person from making a report or participating in a matter under AS 39.90.100(a) with intent to impede or prevent a public inquiry on the matter is liable for a civil fine of not more than $10,000.

Alaska Stat. § 39.90.120. The statutory scheme did not define "person" and did not define "employer" as including a person. *Id.* § 39.90.140(2). The court reasoned as follows:

Subsection .120(a) authorizes a person who alleges a violation of section .100 to bring a civil action, and it authorizes the court in which the action is brought to "grant appropriate relief, including punitive damages." Subsection (a) does not, however, specify the defendants against whom the civil action may be brought. It is logical to suppose that any person

or entity which is capable of violating or attempting to violate section .100 may be a defendant under subsection (a) of section .120. Subsection .120(b) recognizes that individuals—that is, individual government employees—are capable of violating or attempting to violate section .100.[FN9] It follows that the defendants who may be sued under subsection .120(a) include individuals as well as public employers. Further, this conclusion is implied by the text of subsection .120(b), which states that "a person who violates . . . [section .100] is also liable for a civil fine . . . ." The word "also" implies that the person described is also liable under subsection .120(a).

FN9. To conclude otherwise, one would have to read subsection (b) as authorizing the attorney general of the state to sue the state for a civil fine which would be paid by the state to the state. Such a reading would be an absurdity.

*Salvucci,* 950 P.2d at 1124–25.

Our Whistleblower Act is much more explicit with respect to individual liability than is either the New Jersey statute construed in *Palladino* or the Alaska statute construed in *Salvucci.* I would give our Act the same liberal construction required of all remedial statutes "in favor of the remedy provided by law, or in favor of those entitled to the benefits of the statute," *Ky. Ins. Guar. Ass'n,* 13 S.W.3d at 611, and hold that the Act means what it says—policy-making, supervisory, and managerial employees who violate its provisions are subject to civil actions for punitive damages. Accordingly, I respectfully dissent.